543 So.2d 741 (1989)
In the matter of the ADOPTION OF John DOE, Infant Baby Boy.
Bob DOE and Jane Doe, Petitioners,
v.
Richard ROE and Mary Roe, Respondents.
No. 72593.
Supreme Court of Florida.
April 13, 1989.
Rehearing Denied June 1, 1989.
*742 Chandler R. Muller of Muller, Kirkconnell, Lindsey and Snure, P.A., Winter Park, and Anthony B. Marchese, Tampa, for petitioners.
John L. O'Donnell, Jr. of DeWolf, Ward, O'Donnell & Hoofman, P.A., Orlando, for respondents.
Cynthia L. Greene of Frumkes and Greene, P.A., Miami, Chairman, and Elaine N. Duggar, Tallahassee, Nancy Rainey Palmer, Casselberry, and Cynthia S. Swanson, Gainesville, amicus curiae for The Family Law Section of The Florida Bar.
SHAW, Justice.
We review In Re the Adoption of John Doe, 524 So.2d 1037 (Fla. 5th DCA 1988), to answer a certified question of great public importance. Art. V, § 3(b)(4), Fla. Const.
The facts of the case are fully set forth in the decision below which quoted extensively from the factual findings of the trial court. Richard and Mary Roe met in Tempe, Arizona, in the summer of 1985, and Mary became pregnant in January 1986. Richard did not want marriage and urged Mary to have an abortion because he was not ready to commit to marriage, felt financial pressure, and was troubled by the whole idea of the marriage. Mary refused to abort and upon loss of employment was reduced to living off public welfare and private charity. During the critical period, *743 Richard failed to provide Mary with meaningful emotional or financial support. Nevertheless, they continued to see each other regularly and when the subject of adoption surfaced Richard initially voiced no objection. In July 1986, Mary advised her mother in Florida of her predicament and asked her to seek suitable adoptive parents. This was done and in late July Mary came to Florida to arrange for the Does to adopt her unborn child. Mary continued to maintain contact with Richard and advised him of the adoption arrangements in process. Richard now did not want the child placed for adoption, but still opposed marriage and offered no meaningful support to the now destitute mother. The child was born on 12 September 1986, Mary signed the adoption agreement two days later, and the child was placed in the adoptive home on 15 September. Richard then announced his opposition to the adoption, proposed marriage to Mary, and came to Florida where he signed an acknowledgment of paternity and the child's birth certificate. The adoptive parents refused to voluntarily relinquish the child and went forward with an adoption petition in October. Richard and Mary married in November 1986. After a May 1987 trial, the court entered judgment approving the adoption. The trial judge found that Mary voluntarily consented to the adoption, that Richard's prebirth actions estopped him from opposing the adoption and that his consent was not required because he had legally abandoned the child. Without relying on the finding as the basis for judgment, the court also found that the best interests of the child would be served by the adoption because of bonding between the child and the adoptive parents. On appeal, the district court approved the factual findings of the trial court, agreed that Mary had voluntarily consented to the adoption, but held as a matter of law that Richard's prebirth conduct could not be used as a basis for abandonment and that his consent was therefore required under chapter 63, Florida Statutes (1985). The district court preserved the status quo, pending acceptance or denial of jurisdiction and ultimate disposition by this Court. The district court also concluded that there was no clear authority in Florida on the issue of prebirth abandonment and certified the following question of great public importance.
CAN THE FAILURE OF A PUTATIVE UNMARRIED FATHER TO ASSUME SUPPORT RESPONSIBILITIES AND MEDICAL EXPENSES FOR THE NATURAL MOTHER WHEN SHE REQUIRES SUCH ASSISTANCE AND HE IS AWARE OF HER NEEDS, BE A BASIS FOR A TRIAL COURT TO EXCUSE HIS CONSENT TO THE ADOPTION OF THE CHILD, ON THE GROUNDS OF ABANDONMENT OR ESTOPPEL, PURSUANT TO SECTION 63.072(1), FLORIDA STATUTES (1985).
524 So.2d at 1044.
We first address the issue of the natural mother's consent to the adoption. The adoption here was performed through an intermediary. Pursuant to law, the natural mother was interviewed and counseled by the Department of Health and Rehabilitative Services on 12 August 1986. During the interview, Mary said she was an unmarried parent with one previous child and could not financially support two children as a single parent. She identified Richard Roe as the natural father but said, while he did not deny paternity, he had furnished no meaningful financial support and eschewed responsibility for the child. The terms of the consent, its finality, and irrevocability were explained to Mary and she indicated she understood. Mary said she had thought through her decision and, while it was difficult, she believed adoption was best for everyone. After the birth of the child, Mary executed a consent to the adoption on 14 September 1986 and the child was placed with the adoptive parents on the following day. Within days, Mary attempted to withdraw her consent, maintaining that she had consented under the duress of her personal circumstances and that, with Richard's later agreement to marriage, she now wished to keep the child. The trial judge found that Mary was fully aware of the consequences when she voluntarily executed the consent, that the consent had not been obtained by fraud or *744 duress, and that she could not thereafter revoke her consent. We agree with and adopt the rationale of the district court below in affirming the trial court on this point.
The trial court found the natural mother gave up the baby because of generalized social and financial pressures, but that no one exerted coercion, duress or fraud to procure her consent. Absent a finding of fraud, duress, or undue influence, a natural parent's consent to an adoption is valid and irrevocable upon execution of the written consent. This same rule exists in most other jurisdictions in an effort to balance the welfare and rights of the child and both sets of parents involved in an adoption. If consents to adoption were freely made voidable, the stability of adoptive families and the institution of adoption itself would be threatened.
Id. at 1041 (footnotes omitted).
Having determined that the natural mother's consent to adoption was valid and could not be revoked, we turn to the more troublesome issue of whether the natural father's consent to the adoption could be waived under the circumstances present here. The trial court found, and the district court agreed, that because of bonding of the child to the adoptive parents, the child would be psychologically damaged if it were removed from the adoptive home at that stage of the proceedings. The court held, nevertheless, "that the best interest of the child is not a relevant factor unless the child was legally available to be adopted." Id. at 1041 (footnote omitted). This broad statement requires qualification. The issue here was whether the natural father's conduct prior to acknowledging paternity on 19 September 1986 constituted abandonment, or, restated, whether the natural mother had the sole right and authority before that date to consent to the adoption. At that time, the child had only been with the adoptive parents for a period of days and bonding was minimal. Thus the child's best interest as evidenced by subsequent bonding to the adoptive parents was not a significant consideration in this case. This must be the rule because, otherwise, a tentative placement or erroneous judgment would be effectively unreviewable and we would have adopted a rule that physical custody, because of subsequent bonding, is determinative in contested adoptions. However, this does not mean that the best interests of the child as evidenced by bonding to the adoptive parents is not relevant under other circumstances. For instance, there may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred. In such a case bonding would be a material consideration on the issue of abandonment. The child's well-being is the raison d'etre for determining whether a child has been abandoned by a parent or parents. A finding of abandonment under chapter 63 means, for whatever reason, the parent or parents have not provided the child with emotional and financial sustenance and, consequently, the well-being of the child requires severing the parent's legal custody or relationship with the child. Abandonment under chapter 63 is not a criminal prosecution for the purposes of punishing parents, it is a civil proceeding intended to serve the best interests of the child.[1] This recognition of the overarching importance of the child's well-being is consistent with federal case law which "has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed." Lehr v. Robertson, 463 U.S. 248, 257, 103 S.Ct. 2985, 2991, 77 *745 L.Ed.2d 614 (1983). See also Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (constitutional protection of parental rights does not bar state from denying legitimation and granting adoption based on best interests of child).
The parties next dispute the certified question of whether an unwed father's failure to assume prebirth support responsibilities and medical expenses for an unwed natural mother who requires such assistance may constitute abandonment of the unborn child under chapter 63. Section 63.062(1) provides:
(1) Unless consent is excused by the court, a petition to adopt a minor may be granted only if written consent has been executed after the birth of the minor by:
... .
(b) The father of the minor, if:
1. The minor was conceived or born while the father was married to the mother.
2. The minor is his child by adoption.
3. The minor has been established by court proceeding to be his child.
4. He has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the minor and has filed such acknowledgment with the vital statistics office of the Department of Health and Rehabilitative Services.
5. He has provided the child with support in a repetitive, customary manner.
Under section 63.072(1), the court may excuse consent of a parent who has abandoned a child. The word "abandoned" is not defined in chapter 63, but chapter 39, Florida Statutes (1985), titled Proceedings related to juveniles, defines abandoned as follows:
(1) "Abandoned" means a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the person responsible for the child's welfare, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent or legal custodian, or person primarily responsible for the child's welfare to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. The failure by any such person to appear in response to actual or constructive service in a dependency proceeding shall give rise to a rebuttable presumption of such person's ability to provide for and communicate with the child.
§ 39.01(1), Fla. Stat.
The natural father here filed an acknowledgment of paternity in accordance with section 63.062(1) on 19 September 1986. Thus, his consent was required unless he had previously abandoned the child. Relying on the definition of "abandoned" in section 39.01(1), the district court concluded that the reference to communicating with the child meant, as a matter of law, there could be no abandonment of an unborn child because there could be no communication with an unborn child. While it is true that there can be no statutory abandonment under chapter 39 until the child is born, it does not follow that prebirth conduct is irrelevant to adoption proceedings. We note, first, that the definition of "abandoned" is limited by its terms to chapter 39. However, even under this chapter, communicating, or failing to communicate, with a child, while relevant to the issue of abandonment, is not dispositive: the failure to communicate does not conclusively establish abandonment and, conversely, communicating with the child does not conclusively prove a settled purpose to provide for the welfare of the child and assume all parental duties. Assuming for the moment that prebirth conduct is relevant to material facts bearing on abandonment, we see nothing in chapters 39 and 63 which precludes the courts from receiving relevant evidence of prebirth conduct by the father. The root issue then is whether prebirth conduct is relevant to the issue of abandonment under chapter 63. In Florida, evidence is relevant if it tends to prove or *746 disprove a material fact and, unless prohibited by law, all relevant evidence is admissible. §§ 90.401, .402, Fla. Stat. (1985). We conclude that prebirth conduct does tend to prove or disprove material facts bearing on abandonment and may be properly introduced and used as a basis for finding abandonment under the statute.
The importance of prenatal care to the future mental and physical health of the child has long been recognized.[2] The health or well-being of the child is a continuum which extends back to the pregnancy of the mother: a child's good health does not magically begin at birth, it is powerfully affected by the nutrition and health care received by the mother during pregnancy. In establishing the Women, Infants and Children Program (WIC), for example, Congress found that substantial numbers of pregnant, postpartum, and breast-feeding women, infants, and children were at special risk with respect to physical and mental health by reason of inadequate nutrition or health care. Pub.L.No. 95-627, § 3, 92 Stat. 3603 (1978) (codified at 42 U.S.C. § 1786 (1988)); ch. 88-153, Laws of Fla. In point of fact, the WIC Program is grounded on the sound principle that the health of the mother and unborn child are integral to the health of the child after delivery. Societal norms, and chapters 39 and 63 of Florida Statutes, contemplate that the natural parents will provide for the well-being of the child. When either or both fail to do so, the best interests of the child, and of society, require that society intercede, as in, for example, abandonment or adoption proceedings. Because prenatal care of the pregnant mother and unborn child is critical to the well-being of the child and of society, the biological father, wed or unwed, has a responsibility to provide support during the prebirth period. Respondent natural father's argument that he has no parental responsibility prior to birth and that his failure to provide prebirth support is irrelevant to the issue of abandonment is not a norm that society is prepared to recognize. Such an argument is legally, morally, and society indefensible.
Prebirth conduct by an unwed father as it relates to the pregnant mother who needs the support of the father directly impacts upon the welfare of the child. The unwed pregnant mother who is unable to obtain needed support from the father is necessarily forced to take upon herself the entire responsibility for caring for the unborn child and for making necessary plans for the well-being of the child when born. The intermediary adoption program which the mother selected here is one of the options provided by the state to protect the best interests of the child, the parents, and the state. If the biological father retains an absolute veto over the decision of the abandoned pregnant mother to place the child for adoption, the mother's ability to provide for the best interests of the child and herself are nullified. Clearly this is not legislative intent.
In summary, the issue of abandonment turns on the question of whether the parent has evinced a settled purpose to assume parental duties. Providing prebirth support to the unborn child is a parental duty. Evidence of whether the parent has or has not furnished customary support to the pregnant mother is relevant to the issue of abandonment. In answer to the certified question, we hold that an unwed father's prebirth conduct in providing or failing to provide support responsibilities and medical expenses for the natural mother is relevant to the issue of abandonment under section 63.072(1). We caution that this analysis cuts both ways. In circumstances other than those here, an unwed father would be justifiably entitled to argue that his conduct in providing prebirth support to his unborn child was relevant to his claimed right to refuse consent to the adoption of his child.
Respondent natural father also argues that even if his prebirth conduct is considered relevant to the abandonment issue, his conduct did not show that he abandoned the child or the mother. In support he cites certain minimum assistance that he *747 gave the mother after she became pregnant. This evidence of support, along with the evidence of nonsupport, was presented to and considered by the trial court. With due deference to the fact finder who heard the evidence and observed the demeanor of the witnesses, we are satisfied that the record supports the trial judge's conclusion that the respondent natural father's efforts were marginal and did not evince a settled purpose to assume parental duties.[3]
Based on his position that section 63.072 does not permit the use of prebirth conduct in determining abandonment of the child, respondent natural father argues that denial of his right to refuse consent to the adoption is without statutory warrant. Consequently, he argues, denial of his parental rights violates the due process clause of the fourteenth amendment to the United States Constitution. We disagree. Abandonment as evidenced by pre- and postnatal conduct is the statutory basis, and warrant, for the waiver of consent by respondent natural father.
The natural father next argues that the trial court denied him equal protection under the fourteenth amendment by relying on his prebirth conduct as an unwed father when similar conduct by an unwed mother or married father could not form the basis for denial of parental rights. This argument misapprehends the nature of the issue. Unwed mothers and married fathers, indeed all parents, are subject to the loss of parental rights when they abandon their children. The issue here is whether evidence of prebirth conduct by a parent is relevant to the issue of whether the parent has abandoned the child. We hold that such evidence is relevant. Section 63.072 is neutral as to sex and marital status of the parent who has allegedly abandoned the child. The weight to be given prebirth conduct will vary from case to case depending on the conduct itself and other circumstances of the particular case, but, in as far as the particular prebirth conduct tends to prove or disprove that the parent has or has not abandoned the child at issue, such evidence is relevant and admissible regardless of the sex or marital status of the parent. Moreover, while the relationship between a parent and child is constitutionally protected, equal protection does not bar rational distinctions between parents. Quilloin v. Walcott, 434 U.S. 246, 254-56, 98 S.Ct. 549, 554-55, 54 L.Ed.2d 511 (1978).
Finally, respondents argue that Florida's intermediary adoption procedure denies due process and equal protection rights because it does not give adequate notice to natural parents and does not permit them to withdraw consent, absent a showing of fraud or duress. On the issue of notice, section 63.122(4)(c) requires that notice be given to any person whose consent to the adoption is required unless that person has consented to the adoption. Respondents argue that notice should also be given to any person regardless of whether they have consented. We note, first, that under section 63.122(4)(d) any person who is seeking to withdraw consent is entitled to notice of the adoption hearing and, further, there is no question here that both natural parents appeared and fully contested the adoption procedure. On the equal protection issue, respondent natural mother argues, as a parent in an intermediary adoption, that her consent is irrevocable under section 63.082(5), absent a showing of fraud or duress, whereas parents in an agency adoption "have the unfettered right to withdraw their `consent' or surrender." In re I.B.J., 497 So.2d 1265, 1266 (Fla. 5th DCA 1986), review denied, 504 So.2d 766 (Fla. 1987). Respondents' argument is misplaced for two reasons. First, the provision in section 63.082(5) that consents to adoptions may not be withdrawn, absent fraud or duress, is applicable in all adoption proceedings. Second, In re I.B.J. was a dependency proceeding under chapter 39, as the court made clear, not an adoption proceeding under chapter 63. To the degree *748 that it suggests that a consent to adoption may be withdrawn at will, absent fraud or duress, we disapprove In re I.B.J.
Underlying and intertwined in the parties' arguments are the constitutional effects on the case at hand of Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Quilloin; Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); and Lehr. These cases have been extensively reviewed and analyzed elsewhere[4] and are not directly on point. The decision and analysis in Lehr, however, does address the parental rights of an unwed biological father who does not assume the responsibilities of parenthood. Several observations of the Court are pertinent here.
[T]he rights of the parents are a counterpart of the responsibilities they have assumed.
Lehr, 463 U.S. at 257, 103 S.Ct. at 2991.
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban, 441 US, at 392, 60 L Ed 2d 297, 99 S Ct 1760, his interest in personal contact with his child acquires substantial protection under the Due Process Clause... . But the mere existence of a biological link does not merit equivalent constitutional protection.
Id. at 261, 103 S.Ct. at 2993.
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
Id. at 262, 103 S.Ct. at 2993-94 (footnote omitted).
The Court [in Caban] made it clear, however, that if the father had not "come forward to participate in the rearing of his child, nothing in the Equal Protection Clause [would] preclud[e] the State from withholding from him the privilege of vetoing the adoption of that child." Id., at 392, 60 L Ed 2d 297, 99 S Ct 1760.
Id. at 267, 103 S.Ct. at 2996.
It is clear from Lehr that the biological relationship offers the parent the opportunity to assume parental responsibilities. Parental rights based on the biological relationship are inchoate, it is the assumption of the parental responsibilities which is of constitutional significance.
Commentators have emphasized the constitutional importance of the distinction between an inchoate and a fully developed relationship. See Comment, 46 Brooklyn L Rev 95, 115-116 (1979)("the unwed father's interest springs not from his biological tie with his illegitimate child, but rather, from the relationship he has established with and the responsibility he has shouldered for his child"); Note, 58 Neb L Rev 610, 617 (1979)("a putative father's failure to show a substantial interest in his child's welfare and to employ methods provided by state law for solidifying his parental rights ... will remove from him the full constitutional protection afforded the parental rights of other classes of parents"); Note, 29 Emory LJ 833, 854 (1980)("an unwed father's rights in his child do not spring solely from the biological fact of his parentage, but rather from his willingness to admit his paternity and express some tangible interest in the child"). See also Poulin, Illegitimacy and Family Privacy: A Note on Maternal Cooperation in Paternity Suits, 70 Nw U L Rev 910, 916-919 (1976) (hereinafter Poulin); Developments in the Law, 93 Harv L Rev 1156, 1275-1277 (1980); Note, 18 Duquesne L Rev 375, 383-384, n 73 (1980); Note, 19 J Family L 440, 460 (1980); Note, 57 Denver *749 LJ 671, 680-683 (1980); Note, 1979 Wash ULQ 1029, 1035; Note, 12 UCD L Rev 412, 450 n 218 (1979).
Lehr at 261 n. 17, 103 S.Ct. at 2993 n. 17. The failure to assume parental responsibility is abandonment and, under Lehr, is sufficient ground to deny parental rights.
For the reasons set forth above, we concluded that it was critical to the well-being of the child that the unwed father provide prebirth support to the unwed pregnant mother when such support is needed and within his means. Having determined that the welfare of the child is an element to be considered in an adoption proceeding, we are ineluctably led to the conclusion that prebirth conduct is relevant to the issue of abandonment. In the instant case, we hold that the failure of respondent natural father to provide prebirth assistance to the pregnant mother, when he was able and assistance was needed, vested respondent natural mother with the sole parental authority to consent to the adoption of the child and removed from the natural father the privilege of vetoing the adoption by refusing to give consent.
In reaching the two holdings above, we rely on the relationship recognized in Lehr between the assumption of parental responsibilities and biological fatherhood, but our decision is reinforced by the public policy interests of society in encouraging unwed fathers to assume parental responsibilities. The failure of unwed fathers to assume parental responsibility both pre- and postbirth is a major national problem. The recently enacted Family Support Act, Public Law No. 100-485, 102 Stat. 2343 (1988), places major emphasis on national and state programs to establish paternity of illegitimate children and to enforce child support by unwed fathers. See Legislative History of Pub.L.No. 100-485, reported in 1988 U.S.Code Cong. & Admin. News 2776-3015. As the Congress found in enacting the WIC Program, substantial numbers of pregnant women and unborn children are placed at special risk with respect to physical and mental health by inadequate nutritional or health care. The failure of unwed fathers to provide support during pregnancy is certainly a major factor in this public problem and transfers the burden to society at large, at it did here. Lehr, as applied here, also represents sound public policy. Finding no constitutional or statutory provisions that would preclude the state from embracing such a policy, we answer the certified question in the affirmative, quash the district court decision below, and remand for proceedings consistent with this opinion.
It is so ordered.
EHRLICH, C.J., and OVERTON, GRIMES and KOGAN, JJ., concur.
BARKETT, J., concurs specially with an opinion, in which KOGAN, J., concurs.
McDONALD, J., dissents with an opinion.
BARKETT, Justice, specially concurring.
I agree with the majority but write separately to emphasize that parents may not be stripped of parental rights lightly. Indeed, the sanctity of the parent-child relationship is a liberty interest protected under both the state and federal constitutions. E.g., Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); In the Interest of R.W., 495 So.2d 133 (Fla. 1986); In the Interest of D.B., 385 So.2d 83 (Fla. 1980). So strong is this interest that the only civil proceeding in which a person is entitled to free public counsel in Florida is a proceeding to terminate parental rights. R.W.; D.B.
Obviously, however, a parent can relinquish parental rights by his or her actions. Thus, I believe that we have correctly construed and applied "abandonment" as it relates to the need for paternal consent under section 63.062(1), Florida Statutes. However, the precedent set by this case cannot carry over into those situations involving the prenatal responsibilities of mothers, in which substantially different factual problems and different competing *750 rights and interests necessarily arise and must be evaluated.
KOGAN, J., concurs.
McDONALD, Justice, dissenting.
Today the Court deprives a now married couple of their natural child because the mother gave an economically duressed consent for adoption and the father, prior to the birth of the child and prior to their marriage, failed to fully support the mother. This is done without a finding that the natural parents are unfit in the slightest. I think it a sad day.
The opinion of the Fifth District Court of Appeal in this case should be approved because its legal analysis is correct. As stated therein:
The key issues in this case ... are whether abandonment or desertion may be used as the sole basis to excuse the necessity for consent to an adoption under Chapter 63; and whether a putative natural father can abandon his child by neglecting his responsibilities to support the natural mother during pregnancy and assist with her pre-birth medical expenses.
In re Adoption of Doe, 524 So.2d 1037, 1043 (Fla. 5th DCA 1988). After a thorough discussion of relevant case law, the district court concluded that pre-birth acts of abandonment do not excuse consent. Id. at 1044. The district court majority is correct. I further add that, even if pre-birth conduct can be equated to abandonment, the conduct of the father in this case falls far short of abandonment.[1]
What the father did, or failed to do, is less than he should have. Even so, his acts fall far short of demonstrating an intent to abandon the mother and the unborn child. He did not repudiate or renounce them; he did not permanently forsake them for others or self; he did not demonstrate a continuing disinterest in their fate.
Florida has heretofore properly taken a narrow view as to what constitutes abandonment. Abandonment must be proven by clear and convincing evidence and must be complete.[2] I am aware of but two appellate decisions, both bottomed on facts much more egregious over a substantial time after birth than exist here, where abandonment was established.[3] There are a legion of Florida cases where the courts have found that abandonment was not established.[4]
No justification exists in this case for the trial judge to excuse consent. Section 63.062, *751 Florida Statutes (1985), requires that written consent be executed after the birth of a child. If abandonment is to take the place of or excuse consent, does it not follow that such action also take place after birth? It should.
This Court, by its decision, is wrongfully disturbing one of the most fundamental rights of human relations when it deprives the natural parents of the rights, privileges, and responsibilities of rearing their child. Such rights can be forfeited only upon a showing of unfitness or rejection by the parents. While I have grave doubts concerning the issue of whether the mother's consent was valid because of the turmoil in her life and the economic pressures exerted upon her, it is clear that adoption requires the consent of both parents. Here, the father never consented and sought to obtain the child immediately upon his birth. The adoptive parents are interlopers, albeit benign, in this case. The issue of the best interest of this child arises only when the child is legally free for adoption. § 63.022(2), Fla. Stat. (1985). Were that issue to be reached, history has demonstrated that, unless unfit, the best interest of the child lies with the natural parents. It is but a matter of time before this child will learn of his adoption and wonder why. All that can be said to him is that, even though your mother wanted you, the adoptive parents and the courts would not let her have you because in moments of despair she let you go; even though your father wanted you, the adoptive parents and the courts would not let him join your mother in having you because he did not treat your mother as well as he might have when she was pregnant with you. Even to a child these explanations are inadequate.
I would approve the decision of the district court of appeal and direct an immediate delivery of the child to the natural parents.
NOTES
[1] Section 63.022(1), Florida Statutes (1985), provides: "It is the intent of the Legislature to protect and promote the well-being of persons being adopted and their natural and adoptive parents and to provide to all children who can benefit by it a permanent family life." Subsequent to the district court opinion, the legislature has made its intent even more explicit by adding a new subsection 63.022(2)(l), Florida Statutes (1987), which states: "In all matters coming before the court pursuant to this act, the court shall enter such orders as it deems necessary and suitable to promote and protect the best interests of the person being adopted."
[2] Public Health Then and Now: The Origin and Development of Maternal and Child Health Programs in the United States, 75 Am.J. of Pub. Health § 6, 590-98 (June 1985).
[3] To replicate the evidence on which the trial court predicated its findings would serve no purpose other than to render conclusionary criticisms of respondent natural father's conduct. Suffice it to say that we agree with the district court that the findings of fact, a large part of which are set forth in the district court opinion, are supported by the record.
[4] Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson, 45 Ohio St. L.J. 313 (1984).
[1] I will call the natural father Richard and the natural mother Mary. Even though Richard had lost his job at the end of 1985 and did not find another until May 1986, during which time he borrowed money from his father, it is unchallenged that Richard nonetheless:

(1) spent $4000 on Mary for a ski vacation, including new clothes for her;
(2) had a continuing relationship with Mary throughout the pregnancy, which included a ride to "dream" about their future the week before she left, following an evening out for her birthday;
(3) cared deeply for Mary's older son, buying him toys, taking him on outings with and without Mary, paying his insurance premiums;
(4) gave Mary a maternity gown and robe for Mother's Day in May 1986, and money for a new outfit for her birthday just days before she left;
(5) continually took Mary and her son out to eat, or to his apartment where he cooked for them, or to his parents home;
(6) provided his own furniture to furnish Mary's apartment, in addition to the furniture his parents provided at his request;
(7) paid Mary's rent in February, the only time she told him she needed financial help;
(8) never failed to pick up milk, baby food, diapers, and such when Mary asked;
(9) urged Mary to come back to Phoenix to have the child, live with him, and give him time to sort his life out;
(10) opposed the adoption and requested Mary to sign no papers. That Richard did all of this for Mary, her older son, and the baby, after Richard knew she was pregnant and before the baby was born, is uncontradicted in the record.
[2] In re Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977). Accord In re Adoption of Lewis, 340 So.2d 126 (Fla. 1st DCA 1976), cert. denied, 346 So.2d 1248 (Fla. 1977); In re Adoption of Gossett, 277 So.2d 832 (Fla. 1st DCA 1973).
[3] Smith v. Moore, 481 So.2d 36 (Fla. 1st DCA 1985); Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977).
[4] E.g., cases cited supra note 2; Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983), and cases cited therein.