KLEIN, Judge,
dissenting.
In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court held that natural parental rights are such a “fundamental liberty interest” under our Constitution that due process would be violated if those rights could be terminated by anything less than clear and convincing evidence. See also In Re Interest of R.W., 495 So.2d 133 (Fla.1986).
Subsequently, in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) the Court said in a case involving the rights of an unwed father:
The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases....
*933 While the Lehr Court said that a mere biological relationship does not warrant the same constitutional protection as an actual parental relationship, it also noted:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development.
Id. at 254-56, 262, 103 S.Ct. at 2990, 2994.
The Lehr Court was concerned with whether the state of New York had adequately protected the unwed father’s opportunity to form a parental relationship. My concern is whether the application of the Florida statute here adequately protects this father’s opportunity to form that relationship.
The statute, section 63.032(14), Florida Statutes (1993), defines abandonment as a “situation ... sufficient to evince a willful rejection of parental obligations.” Thus, the issue before this court is whether there was clear and convincing evidence of a “willful rejection” by the father of his parental obligations. If the evidence was not clear and convincing, then this father, in being denied the opportunity to develop a relationship with his child, has been denied due process. Santosky.
Our supreme court recently defined “clear and convincing evidence” in Inquiry Concerning a Judge, 645 So.2d 398 (Fla.1994), as follows:
This intermediate level of proof entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum toto of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, (quoting Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983)).
I believe the majority is giving more weight to the trial court’s findings of fact than is proper under Inquiry Concerning a Judge. The majority states that a trial court’s findings based on clear and convincing evidence should be affirmed, unless “it may be said as a matter of law that no one could reasonably find such evidence to be clear and convincing,” relying on In Interest of D.J.S., 563 So.2d 655, 662 (Fla. 1st DCA 1990). The First District made that statement in D.J.S. aftér observing that there was no ease law defining the standard of appellate review of termination proceedings under Chapter 39, Florida Statutes (Supp.1986). It then applied principles set forth in The Florida Bar v. Hooper, 509 So.2d 289 (Fla.1987). I believe the First District’s reliance on Hooper may have been misplaced.
While the Bar in Hooper was required to prove its accusations against the lawyer by clear and convincing evidence, the supreme court’s standard of review in Hooper was governed by Rule 3-7.5(k)(l) of the Rules Regulating The Florida Bar (now renumbered Rule 3 — 7.6(k)(l)(A)), which provided that the referee’s findings of fact “shall enjoy the same presumption of correctness as the judgment of the trier of fact in a civil proceeding.” The Hooper court concluded that this rule means that the referee’s findings must be sustained if they are supported by competent and substantial evidence. Id. at 291. I believe that the D.J.S. court, in reliance on Hooper, was applying the same standard of appellate review as would be applicable in a preponderance of evidence case.
In Inquiry Concerning a Judge, the supreme court, acknowledging the existence of some evidence before the Judicial Qualifications Commission, nevertheless reversed *934 findings of fact purportedly based on clear and convincing evidence, stating:
Testimony before the Commission on this point is indecisive, confused, and contradictory — a far cry from the level of proof required to establish a fact by clear and convincing evidence ...
645 So.2d at 405. The significance of the above language is that in a case where proof must be clear and convincing, the fact that there is some evidence in the record to support the findings does not mean that the appellate court must affirm. Rather, the evidence must be sufficient to convince the trier of fact “without hesitancy.” Id., 645 So.2d at 404.
The method by which an appellate court analyzes evidence in reviewing a judgment based on clear and convincing evidence may well be what is causing this court to be almost evenly divided. I am convinced, however, that the adoptive parents did not sustain their burden of proving, by clear and convincing evidence, that this natural father abandoned his child.
The child was born on August 28, 1992, and the issue of the father’s abandonment was fully tried before the court on October 9, 1992. Following the trial, the court entered a judgment on October 16,1992, emphatically concluding that there was no abandonment:
Based upon the testimony presented, the Court finds that under any definition of abandonment, the natural father has not, in fact, abandoned the natural mother or the child. He has exhibited every available means of attempting to contest the adoption and his desire to have the custody of and to be with his natural daughter was unrefuted during the time of the hearing.
The adoptive parents moved for rehearing, and on January 5,1993, the trial court granted a rehearing, stating:
While the Court is convinced that its order denying the request that the birth father be deemed to have abandoned the child was appropriate, the Court is concerned with due process in that the prospective adoptive child was not represented at the hearing and as such, may be able to develop factual information which could persuade the Court to reverse the previous decision that this Court made.
After more evidentiaiy hearings, and almost one year later, the judge completely reversed himself and entered the judgment which is now on appeal.
Since under Inquiry Concerning a Judge, clear and convincing evidence is that sufficient to convince the court “without hesitancy”, I find it difficult to understand how this trial judge, after finding no abandonment, could find that there was clear and convincing evidence of abandonment. In explaining his reversal, the court stated in the second judgment:
[T]he Court finds that it, in fact, must reverse its previous decision and find that the natural father did abandon this unborn child. The most important testimony that this Court feels establishes that fact is the previously set forth facts of what the natural father did when the adoption application became a reality to him. It is inconceivable to this Court that the natural father would not have made some effort, ANY minimal effort, to contact the natural mother and attempt to work out any kind of an arrangement other than the adoption that she was proceeding with. He just did not do anything other than run to the State of Florida to attempt to get a free lawyer. He showed not only a callous disregard for the natural mother, he also exhibited a complete lack of understanding or feeling toward the unborn child and the resulting chaos it would cause in the life of the infant after her birth and potential placement with the birth (sic) parents. (Emphasis added.)
It thus appears that the trial court may have reversed its prior decision because the father sought a lawyer. This, however, occurred only a few weeks before the birth of the child, and only after the father was advised by the attorney/intermediary that there were court proceedings. Moreover, the termination of parental rights is such a serious matter that, even though it is not a criminal proceeding, the parents are entitled to counsel under the due process clauses of the United States and Florida Constitutions. In Interest of D.B., 385 So.2d 83 (Fla.1980). It *935 thus appears that the court was significantly and unfavorably influenced by the father’s exercising his constitutional right to counsel.
In Santosky, the court observed that “parents subject to termination proceedings are often poor, uneducated, or members of minority groups” and thus “vulnerable to judgments based on cultural or class bias.” This father, I am afraid, may have become a victim of that class bias, as evidenced by the trial judge’s criticism of him for attempting to “get a free lawyer.”
Nor do I think the fact that the father made no effort to “work out any kind of an arrangement” with the mother, after being notified of the adoption proceedings, would be sufficient to establish abandonment. At that time, about two and one-half months had passed since the mother had moved out, and the relationship had ended. Significantly, the trial court found that “the natural parents’ relationship was at best a love-hate situation in its initial stages and deteriorated to the hate side of the scale after the pregnancy and the natural mother’s [January automobile] accident.”
Although the findings of the trial court set forth in the majority opinion certainly show that the father was sometimes abusive to the mother, I do not think his treatment of her constitutes clear and convincing evidence of a “willful rejection of parental obligations”, i.e., abandonment — particularly in light of the fact that the court concluded that the relationship was shaky from the start and that it began to unravel in January, long before the mother moved out in June. Section 63.032(14) says that, in determining whether there has been an abandonment, the court “may consider the conduct of a father towards the child’s mother during her pregnancy.” While I agree that the emotional conduct of the father towards the mother “may” be “considered” under the statute, I do not think that the father’s conduct here is sufficient to constitute an abandonment of parental rights.
In Matter of Adoption of Doe, 543 So.2d 741 (Fla.1989), it was the father’s total lack of any interest in becoming a father, from the moment he was told about the pregnancy, which was the clear and convincing evidence of abandonment. Early on in the pregnancy the father in Doe told the mother to have an abortion because he was not ready to commit to marriage and was troubled by the “whole idea of the pregnancy.” Soon after being informed of the pregnancy the father, knowing he would be looking for a new job in January, spent $4,000 to go on a ski vacation over Christmas. Unlike the present case, in which the parties lived together for the first six months of the pregnancy and pooled their finances, the father and mother in Doe did not live together. The father in Doe paid one month’s rent for the mother in February, and apparently did nothing of substance beyond that until the time the child was born in mid-September, a period of 6 to 7 months. Although the father was aware that the mother had lost her job and was living on unemployment and charity (receiving her groceries from a church), he did not offer her financial assistance. During the pregnancy the father agreed that the child could be placed for adoption, but took a different position just prior to the birth.[3]
In contrast, in the present case the father testified that he was “overjoyed” and “wanted a baby” when told of the pregnancy. The mother’s version was somewhat different, in that she said that the father’s reaction was that he “smiled a little”. Under either version, however, he did not react as the father in Doe did. Neighbors testified that he brought the sonogram over to show them and was happy about the prospects of becoming a father. With the assistance of his mother he bought a crib which they set up in the house. The mother had a two-year-old child by another man living with them and there was unrefuted testimony from the father that he had a good relationship with her child. As he put it, “I supported Linda for a year and a half and her child, and now I don’t want my own?”
The mother decided to leave their home in early June and moved in with a girlfriend. In early July she moved into her own apart *936 ment which was paid for by the adoptive parents. The father did not offer her assistance after she moved out; however, she did not request it. It appears from her own testimony that she wanted nothing more to do with him.
When the father received a letter from the adoptive parents’ lawyer in July 1992 seeking his consent, he immediately telephoned the attomey/intermediary, “emphatically” told her that he was not giving the child up for adoption, and subsequently sought legal assistance from Legal Aid.
My purpose in setting forth the above evidence is not to demonstrate conflicting evidence, but rather to show that this father’s attitude toward the unborn child was entirely different from the attitude of the father in Doe. In Doe, from the time the father knew of the pregnancy he consistently said and acted as though he did not want to be a father. Nor did he give any.financial support to the mother for the six to seven months prior to birth.
In the present case the evidentiary basis for the finding of abandonment was not the father’s lack of interest in becoming a father. Rather, it was abusive conduct by the father towards the mother, in a situation where the father and mother could no longer stand each other, but apparently continued to live together because they were in dire financial straits. Although this father had far less financial resources than the father in Doe, he nevertheless regularly contributed to the mother’s support the entire time they lived together; that is, until she moved out about three months prior to the birth. It is undisputed that the mother did not work following her accident in January. She contributed the food stamps ($203 a month) and the Aid to Dependent Children ($241 a month) which she was receiving. The father paid the rent ($600 a month) and utilities. Although the father did not support the mother after she moved out, she did not seek any support from him, nor seem to want any contact with him whatsoever, probably because she soon began receiving assistance from the adoptive parents.
It thus appears that in Doe the father’s parental rights were terminated because he never showed any interest in becoming a father and did not support the mother for six to seven months during her pregnancy, while here the father’s parental rights were terminated solely because of his abusive conduct towards the mother during her pregnancy.
At the risk of repetition, I again quote the Lehr Court:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring.
463 U.S. at 262, 103 S.Ct. at 2994. This father will never have the opportunity to form a relationship with his biological offspring because of his conduct which was directed solely towards the mother at a time when whatever love which had existed in their relationship had turned to hate.
While I do not condone the father’s conduct towards the mother, and while I cannot say that the legislature did not intend that emotional conduct be considered by the court, I nevertheless question how trial judges can fairly or consistently decide these cases if emotional conduct is á significant factor. The father’s emotional conduct toward the mother cannot be evaluated without considering her emotional conduct towards him. Is he obligated to be emotionally supportive when she wants nothing more to do with him? Should the court consider whether the parents are extremely fragile or overreacting to the strains that a pregnancy puts on a relationship?
The Santosky Court held that the higher burden of proof — clear and convincing evidence — would adequately convey to our trial judges “the level of subjective certainty” about their factual findings which would be necessary to satisfy due process. Id., 455 U.S. at 768-70, 102 S.Ct. at 1403. To me, permitting a court to decide that there is an abandonment based primarily on emotional conduct is mimical to that purpose.
Cases such as this one, in which the mother wants to give up the baby for adoption and the father does not, will not arise where the mother and father have a happy loving relationship. More likely than not the pregnancy will have resulted from a loving rela *937 tionship gone sour or one in which there was no love in the first place. Under either of those circumstances, it is highly unrealistic to expect emotional support from the father to the mother.
I am well aware that if the best interests of the child were a significant factor in this ease, the adoptive parents might well prevail. However, Doe says the best interests of the child are not significant where the father timely objects to the adoption proceeding prior to bonding with the adoptive parents. I am concerned that the trial judge, who initially found no abandonment, could not bring himself to remove the baby from the adoptive parents, when he reconsidered and found abandonment almost one year later.
I am also well aware that the mother is the one who carried and gave birth to this child, and undoubtedly has the best interests of this child in mind. That does not, however, justify violating this natural father’s constitutional rights. Because it is a denial of due process to terminate this “fundamental liberty interest” without clear and convincing evidence, and because this evidence did not constitute clear and convincing evidence, as defined in Inquiry Concerning a Judge, I cannot agree that this judgment should be affirmed. I do agree with the majority’s certification of the question of great public importance. I also agree with Judge Par-iente’s comments about the intermediary.
FARMER, GUNTHER, WARNER and STEVENSON, JJ., concur.

. The supreme court did not set forth all of the facts in its opinion in Doe, but referred to the facts set forth in In Re The Adoption of John Doe, 524 So.2d 1037 (Fla. 5th DCA 1988).