ANSTEAD, Justice,
dissenting.
Fathers, beware. Hard cases do indeed make bad law. I fear in this case that we have made what superficially appears to be a good parental choice for a helpless child’s well-being but, in doing so, have ignored both the stringent legal test and the exceptional evidentiary showing that must be made to deprive a natural parent of all parental rights. In essence, we have given our stamp of approval to a holding that a father may be deemed to have abandoned and forfeited all rights concerning his unborn child based on the father’s estrangement from the child’s mother, a mother, in fact, who has herself willingly renounced any parental rights to the child, and who openly opposes any relationship between the father and the child.
Our initial mistake, in my view, is in applying the concept of abandonment to prebirth situations when the concept has traditionally, and with good reason, been limited to relationships between parents and their actual, existing children. To make matters worse, we are applying it in an undisciplined fashion to a relationship between a father and an unborn child during an extremely brief period of time immediately before the child is born.[23]
As set out in an unbroken line of cases, and, indeed, made explicit in section 39.01(1), Florida Statutes (1993), abandonment means a “willful rejection of parental obligations.” To be guilty of abandonment, a parent, while able, must be found to have made “no provision for the child’s support” and made “no effort to communicate with the child.” Id. Of course, this definition contemplates the actual birth of a child to communicate with and to support. As this Court actually wrote in In Re Adoption of Doe, 543 So.2d 741, 745 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), “there can be no statutory abandonment under chapter 39 until the child is born.” However, here, as in Doe, after correctly stating this proposition, the majority promptly ignores it and embraces a concept more accommodating to the hard facts of this case. It is this initial divergence from the fundamental concept that ordinarily a child must be born before it can be abandoned, that has led this Court to now literally strip natural fathers of their parental rights even before their children are born. It is more than “fathers beware,” it is now “prospective fathers beware.” You now may be found to have abandoned your child even before he or she is born.
After “abandoning” the sound rule that a child cannot be abandoned until it is born, the Court next makes a misstep of similar proportion. Instead of focusing on the stringent definition of abandonment established by statute and case law, with its long pedigree, the Court actually embraces a new definition of abandonment that is again more accommodating to the hard facts we face. The trial court here held: “The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child was abandoned.” 647 So.2d 918, 922-23 (Fla. 4th DCA 1994).[24] In *981 approving this as a proper test for abandonment, this Court focuses on loose language in section 39.01(1) that was not intended to supplant and is at odds with the long-established stringent test of abandonment.[25] This language is used to suggest that a father may be denied any parental rights unless he can establish that he acted consistent “with a settled purpose to provide for the welfare of the child and assume all parental duties” before the child is born. Indeed, we actually said this out loud in Doe: “The failure to assume parental responsibility is abandonment and, under Lehr [v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) ], is sufficient ground to deny parental rights.” 543 So.2d at 749. By some mystic transformation, these magic words have been invoked to shift the burden of proof away from those seeking to cut off the natural parent’s rights, and onto the natural father to prove that he has always acted with “a settled purpose to assume all parental responsibilities.”[26] This transformation is made complete in Doe when the natural father’s interest in his child is sacrificed in deference to the “mother’s ability to provide for the best interests of the child and herself.” Id. at 746.
By this action, we have effectively ignored and retreated from the long-honored and consistently stringent standard of abandonment set out in numerous Florida cases such as In re Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977).[27] In Noble the court reversed an adoption involving facts much more egregious than those involved herein, and declared:
Adoption completely severs parental ties. Such permanent termination of parental rights and responsibilities must not be ordered without parental consent except upon clear and convincing proof that the natural parent has conducted himself in such a way as to show a complete aban *982 donment of the child. La Follette v. Van Weeldon [sic], 309 So.2d 197 (Fla.D.C.A. 1st 1975).
We decline to follow Jones v. Allen, 277 So.2d 599 (Fla.D.C.A. 2nd 1973). That case held that something less than complete and total abandonment by natural parents was sufficient to permit adoption by strangers. Neglect by the natural parents or disinterest and failure to carry out parental obligations does not justify adoption of a child by strangers over the natural parents’ objection. Temporary failures and dereliction of parents, while possibly justifying deprivation of custody, will not support judgment of adoption. In re Adoption of Gossett, 277 So.2d 832 (Fla. D.C.A. 2nd 1973). We follow the stringent standard of Wiggins, supra [Wiggins v. Rolls, 100 So.2d 414 (Fla.1958) ].
Id. at 1216-17. By our ruling today, the long line of cases exemplified by Noble and Wiggins is ignored, and a new principle is announced that says: “Father, unless you can prove that you have demonstrated a settled purpose to assume all parental responsibilities, even before your child is born, you lose. Never mind that we have not warned you about this.”[28]
Finally, we have sealed the natural father’s fate by giving lip service to the clear and convincing standard of proof, and then effectively abandoning it by simply deferring to the trial court’s fickle judgment. Judge Dewey Johnson, writing for the First District, has described the clear and convincing standard with simple eloquence:
A natural parent may submit to an adoption by giving consent. He may so conduct himself as to show a complete abandonment. But, absent the two criteria cited supra, it takes a mighty clear and convincing set of facts before the privileges and responsibilities of the father can be taken away from him.
La Follette v. Van Weelden, 309 So.2d 197, 198 (Fla. 1st DCA 1975). Litigants should properly be concerned as to whether we have now eliminated any appellate safeguard to ensure that a trial court adheres to this important standard. Here we have the specter of a trial judge conducting a trial and emphatically concluding that the father did not abandon his unborn child under any definition of abandonment. Then, after information is disclosed on rehearing that the father has a criminal past, the trial court flip-flops, and now decides that the father did abandon the child, because the father, when first informed of the pending adoption proceedings, “did not do anything other than run to the State of Florida to attempt to get a free lawyer.” Incredibly, the fact that the father objected to the adoption immediately upon being contacted for the first time by the intermediary is cited as clear and convincing evidence of the father’s willful abandonment of the child.
If this scenario were not enough, in itself, to demonstrate the lack of clear and convincing evidence of abandonment, we need only look to the continuation of the proceedings on appeal, where the district court initially reversed the trial judge’s flip-flop, and then did its own flip-flop on rehearing en banc and split six to five in overturning the initial panel decision. It is important to note the flip-flop in the appellate court was not based on any novel legal issue, but rather on a new majority view that there was record evidence to support the trial court’s holding. A difference in one vote would have left the panel decision intact. Based upon this course of events, at both the trial and appellate levels, it strains reason to conclude that the proof of abandonment in this case was so clear and convincing as “to convince the trier of fact without hesitancy.”[29]
*983 The relationship between a child and his or her natural parents has long been recognized as a fundamental value in this nation and state:
The right of the parents to the custody, care and upbringing of their children is one of the most basic rights of our civilization, The emphasis upon the importance of the home unit in which children are brought up by their natural parents is one of the great humanizations of western civilization as contrasted with the ideologies of some nations where family life is not accorded primary consideration.
Beagle v. Beagle, 654 So.2d 1260, 1264 (Fla. 1st DCA 1995) (Webster, J., specially concurring) (quoting Foster v. Sharpe, 114 So.2d 373, 376 (Fla. 3d DCA 1959)). The problem of legislating a clear and fair scheme for the adoption of newborn children is difficult, but must be addressed squarely and with fairness, and in recognition of the interests of all of the parties involved. While we wish to act in the best interests of the helpless child, we do that child no honor and, indeed, do her a disservice by ignoring the long-cherished and once-recognized interests of her natural father. Family values, indeed.

. It is difficult, if not impossible, to imagine a court ruling being upheld when it is predicated upon a parent’s similar conduct occurring during such a limited period of time after a child, is bom and when the mother and father have become estranged.

. Consider the analysis employed by the majority opinion on rehearing en banc in the district court:
The trial court did not and we need not distinguish between married and unmarried parents in discussing the issue of abandonment as it applies in this case. Because we conclude with a certified question, however, we suggest that there is a substantial practical and legal difference between the legal status of a birth father married to the birth mother and one who fathers a child out of wedlock. The married father is, from the outset, legally responsible to support the child. The unmarried father has no such automatic legal responsibility. He must take some positive action to assume the responsibilities of parenthood before he becomes entitled to exercise the rights of parenthood. This is only fair. It is also a recognized legal principle. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). See also, Caban v. Mamen [sic], 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). (We do not overlook the exception created by paternity suits, but that exception has no relevancy here.) It is therefore reasonable and logical to examine the question whether an unmarried father has in fact evinced a settled purpose to assume all parental duties and the corollary that if he "makes only marginal efforts that do not evince a set *981 ty purpose to assume all parental duties, the court may declare the child to be abandoned.” Matter of Adoption of Doe, 543 So.2d 741, 745 (Fla. 1989). The trial court found that to be the situation here.
In re Adoption of Baby E.A.W., 647 So.2d 918, 923 (Fla. 4th DCA 1994).

.Section 39.01(1), Florida Statutes (1985), provides:
“Abandoned” means a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the person responsible for the child’s welfare, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent or legal custodian, or person primarily responsible for the child’s welfare to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. The failure by any such person to appear in response to actual or constructive service in a dependency proceeding shall give rise to a rebuttable presumption of such person's ability to provide for and communicate with the child.
(Emphasis added.)
Interestingly, in Doe, after discussing the above provision, we stated: "We note, first, that the definition of 'abandoned' is limited by its terms to chapter 39.” 543 So.2d at 745.

. Expecting mothers, of course, even in the clearest of situations, and where they give express, written consent to give up their unborn child, still have a statutory grace period after the child is bom, to change their minds. See § 63.212(l)(i)2.a., Fla.Stat. (1993). In other words, even in the clearest example of a willful abandonment in writing by a natural mother, she is given a chance to change her mind. And few would contend that this is not sound policy. Of course, mothers should have the chance to see that child and change their minds about giving the child up. The miracle of birth and the reality of a precious new human being appearing in the flesh is an incomparable event in human society.

. To add to the sleight of hand, the majority opinion places special emphasis on the legislature’s amendment of chapter 63 to add the definition of abandonment set out in chapter 39. In particular, the majority treats the legislature’s adoption of our statement in Doe that prebirth conduct of the father toward the mother may be considered in the abandonment analysis, as if it constitutes a “critical” change in the law of abandonment that we are now bound to follow. Of course, the legislative change is nothing new at all since it is simply a paraphrase of one of our holdings in Doe. More important, however, we have failed to recognize the distinction between adopting an expansive view of relevant evidence to include the prebirth conduct of the father toward the mother, a concept with which everyone agrees, and the quite distinct and radical concept of adopting the attitude of the father toward the mother as the controlling definition of abandonment of the child.

. And never mind that we have recognized greater rights and protections for natural mothers. As Justice Barkett candidly acknowledges in her special concurrence in Doe: "[T]he precedent set by this case cannot carry over into those situations involving the prenatal responsibilities of mothers, in which substantially different factual problems and different competing rights and interests necessarily arise and must be evaluated.” 543 So.2d at 749-50. Whatever happened to equal justice under law? See also supra note 4.

. In other cases we have not hesitated to enforce the clear and convincing standard. In fact, most of the adoption cases involve reversals of trial court orders granting adoptions. See, e.g., In re Adoption of Noble, 349 So.2d 1215 (Fla. 4th *983 DCA 1977). In another example, we set aside sanctions against a judge based on conflicting evidence in In re Davey, 645 So.2d 398 (Fla. 1994), and characterized the proof as “a far cry from the level of proof required to establish a fact by clear and convincing evidence.” Id. at 405.