724 So.2d 1235 (1999)
T.R., Appellant,
v.
ADOPTION SERVICES, INC. d/b/a Chosen Children, Appellee.
No. 98-2628.
District Court of Appeal of Florida, Fourth District.
January 20, 1999.
Judith B. Migdal-Mack of Migdal & Migdal, P.A., Boynton Beach, for appellant.
No appearance for appellee.
STEVENSON, J.
This is yet another case where a natural mother appeals the trial court's order denying a motion to withdraw written consent to surrender a child for adoption and to terminate parental rights. Because the record supports the trial court's decision, we affirm.
The mother, T.R., was in her eighth month of pregnancy when she contacted Adoption Services, Inc., to advise that she wished to surrender her child for adoption. When she contacted the agency, she was nineteen years old, unmarried, unemployed and living at the Salvation Army with an infant daughter. T.R. advised that the father of her daughter and her unborn son had been physically abusive to her and had shown no interest in supporting her financially or emotionally. T.R. tried to locate the father, but was unable to find him. In light of her circumstances, T.R. felt that she had no choice but to contact an adoption agency in order to arrange to give up her soon-to-be-born child. After two weeks at the Salvation Army shelter, she had to leave because there was a two-week limit. She was referred to Women in Distress, where she stayed for another two weeks. She then moved in with a friend who allowed her to stay rent free.
T.R. gave birth to a baby boy on April 3, 1998, and was released from the hospital the following day. Pursuant to arrangements made with the adoption agency and the hospital, she left her newborn son at the hospital to be picked up by the agency. On April 6, 1998, she met with two representatives of Adoption Services in the lobby of the hospital, where she executed a written surrender of her child and a consent to commit the child to the agency for subsequent adoption. The next morning, she called the agency to advise that she had changed her mind and wanted to keep the child. She was told that it was too late. On May 18, 1998, T.R. petitioned the court to set aside the consent and surrender on the grounds of duress. The trial court held a hearing on the motion on May 28, 1998, taking testimony from the mother and the two representatives from the agency, Melissa Mayhew and Sherry Mayhew, who witnessed the mother's execution of the surrender papers. On June 11, 1998, the court entered an order denying the mother's motion to set aside the consent and surrender. The court denied rehearing on July 2, 1998.
On August 6, 1998, the court entered the order now being appealed, entitled "Order on *1236 Petition for Permanent Commitment (Mother)." The order found by clear and convincing evidence that the mother had voluntarily executed a surrender of her parental rights and that the termination of her rights to her son was in the manifest best interests of the child under section 39.4612, Florida Statutes (1997). In this appeal, the mother argues, inter alia, that the trial court erred in not allowing her to withdraw her consent because she signed the papers under duress. While we are sympathetic, we must affirm the order on appeal.
Chapter 63 of the Florida Statutes governs the procedures for adoption. Section 63.082(4), Florida Statutes (1997), provides that a consent for voluntary surrender must be executed only after the birth of the child, in the presence of two witnesses, with the acknowledgment of a notary. Section 63.082(5) provides that "[c]onsent may be withdrawn only when the court finds that the consent was obtained by fraud or duress." Here, the mother does not allege that the adoption agency engaged in any fraud or duress. The mother, in very candid testimony, admitted that she fully understood what she was signing when she signed it, that the Mayhews explained the irrevocability of the consent and surrender to her, and that she voluntarily and knowingly relinquished her rights to her newborn son.
The mother explained that due to her circumstances, she felt it would be the best thing for her child to place him for adoption. She also testified that she had only recently learned that the birth father was still in jail after having been arrested for domestic violence against her. She thought he had been released from jail and had returned to the Bahamas. Believing that there was no one to help or support her in raising yet another child, she made the decision to surrender her child. She testified that she was depressed, was in a "bad position," and had asked that, at the very least, the agency make sure that the child be adopted by people who believe in God and would teach the child about the Bible. The mother told no one she was pregnant and gave birth alone at the hospital. However, upon returning home after signing the surrender papers at the hospital, her friends asked her what was wrong. When she explained why she was upset, her friends assured her that they would support her and help with the child. Unfortunately, the mother never communicated with friends or family about this until after she surrendered the child. The mother is now working full-time as a housekeeper and continues to reside rent-free with a friend.
While conceding that no one pressured her to put the child up for adoption, the mother contends that her circumstancesbeing alone, unmarried, young, and homeless with one child to feedconstituted duress under section 39.464(1), Florida Statutes (1997). She argues that she contacted the agency less than 24 hours after she signed the papers and, at that point, the child had not yet actually been placed for adoption. Under those circumstances, she argues that she should have been able to withdraw her consent and that her parental rights should not have been terminated.
While we sympathize with the mother's plight, we cannot say that the trial court erred, either factually or legally, in finding that the circumstances in this case do not amount to duress under section 39.464(1). Indeed, the facts in this case in regard to the mother are strikingly similar to the facts the court confronted in In Re Adoption of Doe, 543 So.2d 741 (Fla.1989). There, the natural mother was an unmarried parent with one previous child when she signed the consent to the adoption, believing at the time that adoption was the best alternative. She was in dire financial straits and the father "had furnished no meaningful financial support and eschewed responsibility for the child." Id. at 743. After the birth of the child, the mother executed the consent to the adoption but, within days, attempted to withdraw the consent, maintaining that she had consented under the "duress of her personal circumstances and that, with Richard's [the natural father's] later agreement to marriage, she now wished to keep the child." Id. The trial judge found that the mother was well aware of the consequences when she completed the consent and that the consent had not been obtained by fraud or duress.
In approving the district court's affirmance of the trial court's judgment, the Florida Supreme Court stated:
*1237 We agree with and adopt the rationale of the district court below in affirming the trial court on this point.
The trial court found the natural mother gave up the baby because of generalized social and financial pressures, but that no one exerted coercion, duress or fraud to procure her consent. Absent a finding of fraud, duress, or undue influence, a natural parent's consent to an adoption is valid and irrevocable upon execution of the written consent. This same rule exists in most other jurisdictions in an effort to balance the welfare and rights of the child and both sets of parents involved in an adoption. If consents to adoption were freely made voidable, the stability of adoptive families and the institution of adoption itself would be threatened.
543 So.2d at 744 (quoting In Re the Adoption of John Doe, 524 So.2d 1037, 1041 (Fla. 5th DCA 1988)).
In the instant case, as in Doe, the mother was of sound mind and fully understood the alternatives, although she believed at the time that she was acting in the best interests of her unborn child and had no real options in light of her social and financial circumstances. Because the mother's change of heart came so quickly after the birth of the child, the result in this case may seem unduly harsh when viewed from the natural mother's perspective. We echo the sentiments expressed by the Second District in Hindman v. Bischoff, 534 So.2d 743, 745 (Fla. 2d DCA 1988), that a "cooling-off" period might be a wise option for the legislature to consider in situations like the instant one. Discussing In Re Adoption of Baby Girl "C", 511 So.2d 345 (Fla. 2d DCA 1987), the Hindman court stated:
We have been intensely sensitive here, as we were on the occasions when Baby Girl "C" was the subject of litigation, to the conflicting emotions stemming from the adoption of a newborn child. See 511 So.2d at 346. Our compassion causes us to suggest, as also occurred in Baby Girl "C", that the legislature reassess the current adoption statutes and consider the wisdom of a "cooling-off" period, common in several states, during which the actual adoption remains in abeyance. See, e.g., Ga.Code Ann. § 74-404 (10 days); Mich. Comp. Laws Ann. § 710.64(1)(West 1979)(20 days); Ill.Rev.Stat. ch. 110, § 68.3 (1973)(30 days). An opportunity for reflection might avoid the seemingly harsh result that has occurred here. We are without choice in a matter of this kind, however, and must follow the law as it is ordained by the legislature.
534 So.2d at 744-45 (emphasis in original) (footnote omitted).
Based on the holding in Doe, the trial court was correct in determining that the natural mother's consent to the adoption in this case was valid and could not be revoked. We have considered the other issues raised by appellant and find no error. Accordingly, the order on appeal is hereby affirmed.
AFFIRMED.
WARNER and POLEN, JJ., concur.