PARIENTE, Judge,
concurring specially.
INTRODUCTION
I concur in the majority but write separately to express certain concerns and considerations. This case has become emotionally-charged in part because the child who is the subject of the adoption has now resided continuously with the adoptive parents since September 9, 1992, when the trial court entered an order placing the child in the care of the adoptive parents. It is tempting indeed for us to yield to our own emotions that the best interests of this child will be served at this time by custody continuing with the adoptive parents, especially in light of the biological mother’s continued strong desires that her child be adopted into a stable two-parent home. However, we are precluded from considering the reality that bonding between the adoptive parents and child, who is now over two years old, has occurred.
As the supreme court explained in In Matter of Adoption of Doe, 543 So.2d 741, 744 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), the child’s best interests, as evidenced by subsequent bonding to the adoptive parents, cannot be a significant consideration where the biological father has acknowledged paternity and asserted his rights shortly after birth:
This must be the rule because, otherwise, a tentative placement or erroneous judgment would be effectively unreviewable and we would have adopted a rule that physical custody, because of subsequent bonding, is determinative in contested adoptions.
The supreme court explained, however, that if the biological father delays for a substantial period of time after the child is in the physical custody of the adoptive parents, the rule would be otherwise:
For instance, there may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred....

Id.

Thus, at the outset, we are faced with a legal dilemma. We are not to consider the best interests of the child unless the child is legally available for adoption; yet the supreme court has also told us that “[t]he child's well-being is the raison d’etre for determining whether a child has been abandoned by a parent or parents.” Id. (emphasis added). We are not to consider the bonding that has taken place between the adoptive parents and the child; yet we know from the testimony in the record in this case that the child may possibly suffer serious psychological damage upon being removed from the only home she has ever known. See also In Matter of Adoption of Doe, 524 So.2d 1037, 1041, (Fla.App. 5th Dist.1988) quashed on other grounds, Doe, 543 So.2d at 741. This possibility increases the longer the trial and appellate processes drag out, as we weigh the evidence to determine whether it is clear and convincing of pre-birth abandonment by the biological father.
There is another troubling aspect of this case not present in Doe. In Doe, the biological mother and father had married after the birth of the child and acted together in the ensuing litigation to obtain custody of their baby. Here, unlike Doe, from the outset of this litigation, the biological mother has vehemently opposed the biological father’s attempts to fight the adoption. She even made her consent to the adoption contingent on a finding of abandonment, which she hand-wrote into and initialed in the Consent for Adoption:
This consent is given subject to the court finding the birth father[’s] ... consent is not necessary. If his consent is to be required I want custody of my child and hereby revoke this consent, [mother’s initials]. It would be detrimental to said child to be in [the father’s] custody and not in the child’s best interest under any circumstances. [mother’s initials].
*926 The biological mother made her intention to adopt known to the biological father and took all necessary steps pre-birth and post-birth to effectuate the adoption once it was clear to her that her fantasy of marriage and a “Brady [B]unch type of family” with the biological father would not become a reality. Here we have the potential of a child being returned to a biological mother who has consistently believed during pregnancy, and after the child’s birth, that it was in the child’s best interests to be adopted.
The protection, however, that our legislature has provided to certain classes of biological fathers, even where an adoption is desired by the biological mother, is to require the biological father’s consent, unless the biological father waives his right to consent by abandonment. Therefore, the biological father’s consent was a condition precedent to this adoption, unless he abandoned the child. The difficulty we are presented with is in providing a realistic and reasonable interpretation of the term “abandonment” of the child by the biological father within the context of a private adoption which takes place shortly after the birth of the child.
CHAPTER 63 ABANDONMENT DEFINITION
When the supreme court decided Doe in 1989, the word “abandoned” was utilized but not defined in chapter 63, the chapter dealing with private and agency adoptions. It was only defined in chapter 39, entitled “Proceedings related to juveniles,” dealing with termination of parental rights. The problem with the statutory definition set forth in subsection 39.01(1), and subsequently engrafted by the legislature into subsection 63.032(14), is that the primary definition clearly envisions circumstances where the parent has abandoned the child post-birth. For example, the first part of the definition states:
“Abandoned” means a situation in which the parent ... while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations....
§ 63.032(14), Fla.Stat. (1993).
Before a child is born, this first portion of the definition has no practical meaning.
The statutory definition further calls on the court to evaluate the efforts on the part of the parent to support and communicate with the child:
If, in the opinion of the court, the efforts of such parent ... to support and communicate with the child are, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned....

Id.

Again, this provision contemplates efforts to assume parental duties after the child has been born.
The only portion of the statutory definition contained in the adoption chapter which mentions pre-birth conduct is the last sentence. This is also the only sentence which is not part of the Chapter 39 abandonment definition and was added by the legislature after Doe:
In making this decision [whether the parent has evinced a settled purpose to assume all parental duties], the court may consider the conduct of a father towards the child’s mother during her pregnancy.

Id.

Thus, all portions of the statutory definition of abandonment, except for the last sentence, pertain to post-birth efforts to communicate and support the child. Where the adoption takes place within days of the child’s birth, the trial court has only the conduct of the biological father towards the biological mother during her pregnancy to evaluate in determining abandonment of the child. Based on Doe, a trial court is permitted to find abandonment of the child based solely on conduct occurring before the birth of the child during the period of pregnancy.
SCOPE OF “CONDUCT”
The crux of the initial legal dispute between the majority and the minority of this court, as expressed in the panel decision, is what type of conduct the trial court has discretion to evaluate. Is “conduct,” as used in the statutory definition, an all-inclusive term covering both financial and emotional *927 support, as well as all aspects of the pre-birth relationship between the biological father and biological mother? Must conduct be connected to proof of harm to the child?
Both the majority and the minority of this court agree that evidence of financial support of the biological mother during the pregnancy, or lack thereof, is relevant to making this critical decision. See Doe, 548 So.2d at 746. The Doe opinion rejected the biological father’s argument that he had no parental responsibility prior to birth, finding such an argument “legally, morally, and socially indefensible”:
Prebirth conduct by an unwed father as it relates to the pregnant mother who needs the support of the father directly impacts upon the welfare of the child. The unwed pregnant mother who is unable to obtain needed support from the father is necessarily forced to take upon herself the entire responsibility for caring for the unborn child and for making necessary plans for the well-being of the child when born....

Id.

Our views differ on whether the term “conduct,” as used in the statute, encompasses more than financial support. We are faced with supreme court precedent in Doe, as well as statutory directive, that pre-birth “conduct” of the biological father toward the biological mother is a factor to consider on abandonment. In this case, as in Doe, pre-birth conduct, by necessity, is the only factor we may consider because of the timing of the adoption.
Conduct certainly encompasses more than financial support and has a meaning distinct from financial support. Generally, conduct connotes behavior. The same dictionary employed by Judge Farmer in his dissent to define support defines “conduct” as, “[t]he way a person acts, especially from the standpoint of morality and ethics.” American Heritage Dictionary of the English Language 1804 (3d ed.) (emphasis added).
To allow a trial court to base a finding of abandonment purely on failure to provide financial support in a nine-month period has as great, if not greater, potential for infringing on a biological father’s rights to develop a relationship with his unborn child than a finding based on the totality of his conduct towards the biological mother — both emotionally and financially. A hypothetical biological father who provided financial support to the biological mother during her pregnancy, but nothing else, could never be found to have abandoned a child, even though he deserted the biological mother, left all of the decisions concerning the child to the biological mother, failed to render any emotional support to the biological mother, and verbally abused the biological mother throughout the pregnancy.
The supreme court specifically mentioned both financial and emotional support in Doe:
During the critical period, [the biological father] failed to provide [the biological mother] with meaningful emotional or financial support.
543 So.2d at 742-43 (emphasis added).
I do not find evidence, in either the majority’s opinion in Doe, or in the subsequent legislative amendments defining abandonment, indicating an intent to restrict the type of pre-birth conduct which may be considered only to financial support:
The weight to be given prebirth conduct will vary from case to case depending on the conduct itself and other circumstances of the particular case, but, in as far as the particular prebirth conduct tends to prove or disprove that the parent has or has not abandoned the child at issue, such evidence is relevant and admissible regardless of the sex or-marital status of the parent. Moreover, while the relationship between a parent and child is constitutionally protected, equal protection does not bar rational distinctions between parents, [citation omitted].
Id. at 747.
CONSTITUTIONAL CONSIDERATIONS
In evaluating the competing interests of the biological father’s rights, the biological mother’s rights and the child’s rights,[1] the *928 comments of the supreme court in Doe are instructive:
The intermediary adoption program which the mother selected here is one of the options provided by the state to protect the best interests of the child, the parents and the state. If the biological father retains an absolute veto over the decision of the abandoned pregnant mother to place the child for adoption, the mother’s ability to provide for the best interests of the child and herself are nullified. Clearly this is not legislative intent.
548 So.2d at 746.
The United States Supreme Court has interpreted the parent-child relationship as a constitutionally protected liberty interest. However, each Supreme Court case which has considered the extent of the interest, and corresponding constitutional protection of it, has made a clear distinction between the rights of those fathers who have a “mere biological connection” and those fathers who have meaningfully demonstrated a full commitment to the responsibilities of parenthood, assuming an “actual relationship of parental responsibility.” Lehr v. Robertson, 463 U.S. 248, 260, 108 S.Ct. 2985, 2992, 77 L.Ed.2d 614, 625 (1983).[2] As stated in Lehr, the “mere existence of a biological link does not merit equivalent constitutional protection.” Id. at 261, 99 S.Ct. at 2993, 77 L.Ed.2d at 626.
An unmarried, biological father does not have the same constitutional protection in his inchoate potential parent-child relationship as a biological father whose parent-child relationship has been established and where termination of those established rights are sought.
Parental rights based on the biological relationship are inchoate, it is the assumption of the parental responsibilities which is of constitutional significance.
Doe, 543 So.2d at 748.
This is why, in my opinion, Judge Klein improperly relies on Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), for the measure of this biological father’s constitutional rights, by assuming that the biological father in this case has the same constitutional protection as the Santosky father. In Santosky, the biological parents had an established parental relationship with their children prior to the initiation of the neglect proceedings.
By analogy, before a person is deprived of a liberty or property interest, the constitution affords the person due process of law. However, what constitutes due process will vary significantly depending on the nature of the interest. Similarly, before a parental right may be terminated, clear and convincing evidence must be presented. Therefore, while the applicable standard of review is still clear and convincing evidence, the nature of the evidence to be considered varies significantly between those fathers who have “mere biological connections” and those who have developed a parental relationship. The same conduct, which might not be sufficient to terminate a parent’s right in an existing parental relationship (no financial support and lack of interest for several months), may be sufficient, as in Doe, to allow termination of an inchoate relationship.
Although the Supreme Court in Lehr considered the rights of a biological father who had the opportunity to develop a relationship with his child but failed to do so, the Florida Supreme Court, in Doe, found those same distinctions applied to allow termination of an inchoate relationship by evaluating the pre-birth conduct of the biological father toward the biological mother, without running afoul of the constitution.
*929 STANDARD OF APPELLATE REVIEW
Our evaluation of the evidence is dependent, not only on how we define and evaluate the significance of the conduct, but on the standard by which we evaluate the evidence. Do we focus on whether there has been a “willful rejection of parental obligations,” as does Judge Klein, even though “willful rejection” encompasses only the first part of the statutory definition of abandonment? Or do we focus on evidence of only “marginal efforts [by the biological parent] that do not evince a settled purpose to assume all parental duties,” which encompasses the second part of the statutory abandonment definition?
In Doe, the supreme court evaluated the record to determine whether it supported the trial court’s conclusions that the biological father’s efforts were marginal and did not evince a settled purpose to assume parental duties. The supreme court concluded that “the failure to assume parental responsibility is abandonment and, under Lehr, is sufficient ground to deny parental rights.” Doe, 543 So.2d at 749. Thus, I conclude in this case, because we are dealing with an inchoate relationship, the pertinent inquiry is whether the evidence clearly and convincingly established that the biological father’s efforts were marginal and did not evince a settled purpose to assume parental responsibility — not whether there is clear and convincing evidence of a willful rejection of parental duties.
The dissenters use the biological father’s conduct in Doe as the polestar by which to judge the biological father’s actions here. If I were to engage in a “better or worse” comparison, I find the evidence in this ease to be stronger than that in Doe of failure to evince a settled purpose to assume parental responsibilities. In Doe, the biological father showed an initial lack of interest in becoming a father, but by the time of birth had entered into a full blown commitment of parenthood and marriage. Here, I cannot disregard the evidence of the biological father’s total lack of interest in assuming the responsibilities of parenthood, as well as the evidence of his affirmative misconduct towards the biological mother, emotional abuse and seemingly callous disregard for the pregnant mother’s physical and emotional health. By the end of the pregnancy, there was no financial support of the biological mother and no evidence of a settled intent to assume parental responsibilities. While the biological father advised the intermediary that he did not intend to consent to the adoption, the biological father knew of the biological mother’s adoption plan and had told her early on to “do whatever [she had] to do.”
The testimony in this case also shows the biological father indulged to excess in alcoholic beverages, was abusive and belligerent and would scream filthy names at the biological mother, often ordering her out of the house. Terrified of the biological father, malnourished, distraught and unable to bear the strain, the biological mother moved out. While she tried to avoid the biological father, he sought her out — only to aggravate her, never to help. The effects of the biological father’s affirmative misconduct on the biological mother’s health during pregnancy was corroborated by her treating physician and friends. Certainly, the trial court could have found this conduct did not evince a settled purpose to assume all, nor indeed any, parental duties.
Interestingly, the dissenters assert that Doe is a more compelling case of abandonment because, according to Judge Klein, in Doe it was “the father’s total lack of any interest in becoming a father, from the moment he was told about the pregnancy, which was the clear and convincing evidence of abandonment.” Judge Klein transforms evidence of “lack of interest” into proof of “willful rejection” of parenthood.
The dissent fails to mention that in Doe, after first urging abortion because he was not ready to commit to marriage, the biological father, at some period of time prior to the child’s birth, urged the natural mother to come to Phoenix, where he was residing, to have the child, live with him and give him time to make the ultimate decision of marriage. When the biological mother advised the biological father that she would not live with him without the benefit of marriage, the biological father asked the biological mother to “at least think about” letting him raise the child. Throughout the pregnancy, the couple continued to communicate. By the time of *930 birth, the biological father’s commitment to both biological mother and child solidified.
The dissent makes much of the fact that here, the biological father contributed to the biological mother’s support; whereas in Doe, the biological father contributed no support to the biological mother. As pointed out by Judge Hersey, the only reason that any financial support may have been provided in this case arose from the couple living together and sharing expenses as had been the case before the pregnancy. Once the biological mother moved out, due to the biological father’s repeated abusive behavior, financial support ceased. The record further reveals that the biological father knew that the biological mother was receiving financial support from the adoptive parents and told the intermediary in July 1992 that he did not intend to contribute to the biological mother’s support.
Concerning the trial court’s actions in reversing its previous decision, the record reveals that during the second hearing there was additional testimony about the emotional abuse and its effect on the pregnant mother — thereby making it a relevant and important consideration on the issue of abandonment. While sharing Judge Klein’s concerns over the trial court’s reference in its order to the fact that the biological father sought out a lawyer to assert his rights as indicative of his disregard for his future child, I would point out that the statement was made in the context of the trial court pointing to the biological father’s complete failure to make any effort, “ANY minimal effort, to contact the natural mother and attempt to work out any kind of an arrangement other than the adoption that she was proceeding with.”
I consider the fact that the biological father accompanied the biological mother to a prenatal appointment where she underwent a sonogram to determine the sex of the baby, that he apparently placed a picture of the sonogram on the refrigerator and may have bought the biological mother a pair of stretch pants during her pregnancy to be superficial manifestations of the desire to be a father, reflecting the biological father’s total lack of understanding and appreciation of the magnitude of the parental role. These actions do not constitute any evidence of affirmative assumption of parental responsibilities. If Doe is the benchmark by which we measure abandonment, I disagree with the dissent that the standard was not met. As the supreme court stated in Doe:
[W]e are satisfied that the record supports the trial judge’s conclusion that the respondent natural father’s efforts were marginal and did not evince a settled purpose to assume parental duties.
543 So.2d at 747.
CONDUCT OF THE ATTORNEY/INTERMEDIARY
A majority of the members of this court is concerned about the conduct of the attorney/intermediary, Charlotte H. Danciu, in these adoption proceedings. Prior to the birth of the baby, Danciu filed papers with the court, including a report of intended placement, dated August 12, 1992, stating: “The birth fatherf’s] consent has been waived by the court.” On August 12,1992, a hearing was held on the adoptive parents’ motion to waive the biological father’s consent to adoption. On that date, the trial court signed an order waiving the biological father’s consent, stating: “The [flather ... was advised of the pendency of this hearing by attorney Danciu but has deliberately avoided receiving notice of this hearing by a duly appointed process server.” It also recited that: “The father abandoned ... the mother of the unborn child.... ” On September 1st, Danciu filed with the court an unclaimed certified mail letter addressed to the biological father, indicating that the last postal notice to the addressee was dated August 13th, which happened to be the day after the order waiving the biological father’s consent was signed.
There is no evidence in the record, nor have we been apprised of any evidence, to indicate that the biological father deliberately avoided service of the notice of this hearing by a duly appointed process server. On motion for rehearing, the adoptive parents bring to our attention a notice of hearing that was filed just four days before the scheduled hearing on the motion. This notice is not part of the record submitted to us, but we accept the adoptive parents’ contention that *931 it was part of the court file. The notice does not contain a certificate of service; nor does it state whether or how it purportedly was served on the biological father. No motion to waive the biological father’s consent appears in the record and there, in fact, is no statutory procedure for a pre-birth hearing on the issue of abandonment.
Here, Danciu knew the biological father was not consenting to the adoption. Nevertheless, she went forward and obtained a pre-birth order finding that the biological father had waived his rights. Danciu did not inform the trial court of her July 1992 telephone conversation with the biological father, in which he told her that he contested the adoption and refused to consent to it. The testimony in the record also indicates that Danciu did not inform the adoptive parents of the biological father’s objection and refusal to consent until after the birth of the baby, although on motion for rehearing the adoptive parents contest the implicit conclusion that Danciu did not keep them properly informed. In short, we cannot help but think that candor from this intermediary/attorney to the court and her clients, the adoptive parents, might have prevented the series of events which occurred later.
LEGISLATIVE ALTERNATIVES
RE: PROCESS OF CONSENT AND ABANDONMENT
After this court has labored with this case for over a year, I remain concerned that the present standards for judging the biological father’s pre-birth conduct are subjective, uncertain and vague, both for the courts, the biological parents and the prospective adoptive parents. Such standards ultimately create a time-consuming, fact-finding process at the end of which the facts, as determined, still remain subject to varying interpretation and significance.
At the present time, in the case of an adoption which takes place shortly after birth, where the biological mother has consented to the adoption, the trial court is called upon to take evidence on and evaluate a biological father’s conduct towards the biological mother over a several month period during the pregnancy. The decision is one which we have urged be made promptly so that the child’s status not remain in legal limbo. Yet fact-finding without objective criteria is an inherently time-consuming process requiring the taking of testimony that most likely will be contradictory. In this case, as in Doe, the trial court’s fact-finding of the issue of abandonment took place over a period of months, and by the time the issue of abandonment will finally be settled by the appellate process, a period of years will have elapsed.
If the legislature desires a mechanism to assure that unmarried biological fathers act responsibly in the prenatal period, I suggest one possible alternative. The legislature could consider a statutory scheme which might require that the biological mother serve formal notice of her intent to place the child for adoption on the biological father, who then would have a set time to assert his intention to seek custody. The biological father seeking to assert his parental rights would then have to pay a court-ordered amount of pre-birth child support determined by guidelines similar to the child support guidelines. In addition, he might be ordered to attend a pre-birth parenting class and possibly court-ordered counseling. Mediation could be considered where there appeared a reasonable possibility that the biological mother and biological father might reunite as a couple. If the biological father did not comply with the court order, then at the time of birth, the court would have the authority to declare that the biological father had waived his right to consent and the adoption could then proceed.
I offer this suggestion as an example of an alternate method for judging abandonment at the time of birth which would be fairer to the biological mother, the biological father, the child and the adoptive parents. In any revision to the current statutory scheme, the goal should be to render the standards of expected conduct objective, simplify the fact-finding and decision-making process for the courts and expedite the process. As this case demonstrates, expeditious resolution must be a mandate to all courts in any revised scheme.
*932 1994 UNIFORM ADOPTION ACT
Finally, I urge the legislature to look into a more streamlined method of dealing with the issue of parental consent, including consideration of studying the statutory framework set forth in the revised Uniform Adoption Act (1994) drafted by the National Conference of Commissioners on Uniform State Laws. Under the act, unwed biological fathers who know of the biological mother’s pregnancy and, upon learning of the pending adoption, attempt to assert paternity rights, but show no significant signs of responsibility toward the child, are not required to consent.
Under this framework, consent is required of an unmarried biological father who has established his paternity and who has “provided, in accordance with his financial means, reasonable and consistent payments for the support of the minor.” § 2-401(l)(iii)(A). Consent to an adoption of a minor is not required of “an individual whose parental relationship to a minor has been terminated or determined not to exist.” § 2-402(a)(2). There is an elaborate procedure for the time and execution of consents, set forth in sections 2-404 and 2-405, as well as detailed specifications for the content of the consent in section 2 — 406. Finally, under the act, consent may be set aside by notice to the adoptive parents within 192 hours after the birth of the minor. § 2 — 408.
Although abandonment is not per se used as a basis for vitiating the consent, there is a detailed section, entitled “Grounds for Terminating Relationship,” found in section 3-504 of the 1994 revision. This includes direction to the court to “proceed with the hearing expeditiously.” § S-504(c).
In cases of minors who have not attained six months of age, the factors to consider on termination vary and include directions to the court to consider the respondent’s failure to “pay reasonable prenatal, natal and postnatal expenses in accordance with the respondent’s financial means” and the respondent’s “willingness to assume legal and physical custody of the minor.” §§ 3 — 504(c)(i) and (c)(iv). There is a further subsection which allows for termination of the relationship where the “respondent has been convicted of a crime of violence ... and the facts of the crime or violation and the respondent’s behavior indicate that the respondent is unfit to maintain a relationship of parent and child with the minor.” § 3-504(3). If this statute were in place, the biological father’s prior criminal conduct, which was improperly admitted under our current law in this case, would be a potentially relevant factor on the question of termination.
CONCLUSION
I agree that the scope of the definition of abandonment, and specifically, whether conduct includes emotional support, should be re-addressed by our supreme court as this is a question of exceptional public importance for which the courts are in need of further guidance. I also urge the legislature to reconsider the present statutory scheme of chapter 63, mindful of the tremendous problems presented by situations, like those here, where the unmarried, biological father, simply by withholding his consent, thwarts what the biological mother has concluded throughout her pregnancy is in her best interests and the best interests of the child.
GLICKSTEIN and POLEN, JJ., concur.

. See generally DuRocher, Robin, Balancing Competing Interests in Post-Placement Adoption *928 Custody Disputes, How Do the Scales of Justice Weigh the Rights of Biological Parents, Adoptive Parents, and Children?, 15 J.Legal Med. 305 (June 1994).

. The history of constitutional protection of parental rights can be traced beginning with Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), through Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 and Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), to Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).