JOHNSTONE, Justice
(concurring specially).
I concur with the main opinion. I will supply a complete recitation of the facts and will present the rationale I think is correct. The purpose of the detail in the recitation of facts is to demonstrate the patent incorrectness of any theory that the natural father abandoned his child.

Facts

N.G. (the birth mother) and C.V. (the father), Florida residents, met during the summer of 1994. On February 6, 1995, the father and birth mother had their first date. They began an exclusive relationship in February 1995. From February through July 1995, the father and the birth mother dated and sometimes cohabited. In July 1995, the father and the birth mother learned that the birth mother was pregnant.
On August 20, 1995, the father and birth mother became engaged and moved into an apartment together. After the father informed the maternal grandmother of birth mother’s pregnancy, the birth mother called the Pinellas County Sheriffs Department and reported that the father had pushed her down and had hit her, that she had then hit the father with a “hanger,” that the father had grabbed her by the throat, that she had gotten away and had run to the front door of their apartment, that the father had again pushed her down, and that she had hit her head on the couch. On the basis of the birth mother’s complaint, Pinellas County sheriffs deputies arrested the father for assault. The father told the deputies that the birth mother had bitten him earlier that day and that the birth mother had dislocated her shoulder when he held onto her arm as the birth mother attempted to jump out of his truck while the truck was traveling at 55 miles per hour. The birth mother did not seek medical treatment. No criminal charges were brought against the father
In September 1995, the father and birth mother lived together. Without the father’s knowledge, the birth mother called the “Gift of Life Adoption Services,” a Florida adoption agency, to arrange for the adoption of the unborn child. The birth mother received financial support from the adoption agency.
In October 1995, the birth mother called the Pinellas County Sheriffs Department and reported that she “was having a verbal argument with [the father].” She also reported being scared that he might do her harm. The father left the apartment be *710 fore deputies arrived at the apartment. The deputies took no action against the father.
In November 1995, the father and birth mother lived together. In November or December 1995, the father moved out of the apartment. On January 3, 1996, the birth mother and the father argued while in the father’s truck on the way to a Lamaze birthing class. The birth mother called the Pinellas County Sheriffs Department and reported that the father had assaulted her. The birth mother told a responding deputy that the father had grabbed her arm when she tried to exit the father’s truck. She stated also that the father had not slapped or hit her. The deputy reported that the birth mother was uninjured and that she was unwilling to press charges against the father because she believed that the father grabbed her arm to keep her from exiting the truck while the truck was moving.
On January 6, 1996, the birth mother called the father to take her to Lamaze class. The father took the birth mother to Lamaze class. After January 6, 1996, the father called and visited the maternal grandmother and the maternal great-grandmother, looking for the birth mother. In late January 1996, the birth mother secretly took money from the Gift of Life Adoption Services and traveled to Colorado. She did not inform the father of her plans.
In early February 1996, the birth mother returned to Florida without informing the father of her return. On February 5, 1996, the birth mother signed an affidavit stating that C.V. was the father of her unborn child. Thereafter, the Gift of Life Adoption Services telephoned and wrote the father and requested that he consent to the adoption of his unborn child. The father refused to consent to the adoption. After the father refused to give his consent to the adoption of the unborn child, the Gift of Life Adoption Services refused to work with the birth mother.
On February 11, 1996, the father left a note at the birth mother’s apartment. In the note the father asked the birth mother to marry him. Between February 11 and 26, 1996, the father looked for the birth mother at her apartment, at the maternal grandmother’s apartment, and at the maternal great-grandmother’s home. The father left notes for the birth mother. During this time, Adoption by Choice, Inc. (ABC), provided the birth mother with a ticket to Colorado.
In early March 1996, the birth mother returned to Florida, but did not notify the father of her return. She then arranged for ABC to place her unborn child for adoption. The birth mother lied to ABC about the identity of the father of her unborn child. The birth mother told ABC that she did not know who the father was. On March 11, 1996, the father hired an attorney. On March 12, 1996, the birth mother signed a form relinquishing her parental rights to her unborn child.
On March 19, 1996, the birth mother gave birth to Baby Boy G. After she was discharged from the hospital, the birth mother telephoned the father, who went to the birth mother’s apartment. The- birth mother informed the father that their child had been stillborn. The father was very upset. On March 20, 1996, the birth mother signed an affidavit surrendering her parental rights and consenting to the adoption of Baby Boy G. She also signed a second affidavit stating that the name and whereabouts of the “putative father” were “unknown.”
On March 22, 1996, without knowledge of the father, ABC accepted payment of $17,400 from J.M.J. and T.F.J. (the prospective adoptive parents), an Alabama *711 couple, and placed Baby Boy G. with them for the purposes of a final adoption. The prospective adoptive parents accepted Baby Boy G. with written acknowledgement that their adoption of Baby Boy G. was “at risk” because the father had not consented to the adoption. On March 25, 1996, the prospective adoptive parents returned with Baby Boy G. to the couple’s home in Tuscaloosa, Alabama.
In late March, the father asked the birth mother for a death certificate or other documents _ to prove that their child had been stillborn. The birth mother did not have and could not produce any documents to support her statement that their child had been stillborn. During late March through early April, the father, the paternal grandmother, and the father’s friends checked with the bureau of “vital statistics” and checked also with hospitals and funeral homes for a death certifícate. They could not locate a death certificate for Baby Boy G.
On April 10, 1996, in the Circuit Court of Pinellas County, Florida, the father filed a paternity and custody action against the birth mother. He asserted paternity of Baby Boy G. and sought custody of Baby Boy G. On May 22, 1996, in the Circuit Court of Hillsborough County, Florida, ABC petitioned the court to terminate the “unknown” father’s paternal rights to Baby Boy G. On May 26, 1996, in the Pinellas County Circuit Court, the father filed a “Motion for Temporary Injunction.” On May 31, 1996, in the Pinellas County Circuit Court, the father filed a “Subpoena Duces Tecum Without Deposition” to Helen Ellis Hospital, Dr. Matthew Conrad, and Gift of Life Adoption Services.
On June 6, 1996, in the Pinellas County Circuit Court, the father filed “Notice of Production From Non-Party” to Charles D. Hinton, Esq., and an “Amended Notice of Hearing.” During a hearing in the Pinellas County Circuit Court in June 1996, the birth mother admitted that she had given birth to a live baby boy, Baby Boy G., that the father had fathered Baby Boy G., and that she had lied to the father and to ABC about Baby Boy G. By orders dated July 9 and July 10, 1996, the Pinellas County Circuit Court determined the father to be Baby Boy G.’s biological father. On July 19, 1996, in the Pinellas County Circuit Court, the father filed a “Petition for Writ of Habeas Corpus.”
On August 12, 1996, the father petitioned the Pinellas County Circuit Court for an expedited determination of the temporary custody of Baby Boy G. On August 26, 1996, the prospective adoptive parents anonymously moved to intervene in ABC’s Hillsborough County action to terminate the father’s parental rights. The same day, in the Hillsborough County Circuit Court, the prospective adoptive parents also anonymously filed a declaratory judgment action asserting the theory of pre-birth abandonment by the father as constituting implied consent to the adoption of Baby Boy G.
On September 9, 1996, in the Pinellas County Circuit Court, the father filed a “Notice of Hearing.” On September 16, 1996, in the Pinellas County Circuit Court, the father filed a “Motion for Contempt.” On September 20, 1996, in the Pinellas County Circuit Court, the father filed an “Amended Notice of Hearing.” On September 23, 1996, in the Pinellas County Circuit Court, the father filed a “Notice of Production From Non-Party” to Gift of Life Adoption Services. On September 30, 1996, in the Pinellas County Circuit Court, the father filed a “Request for Admissions” to the birth mother. On October 8, 1996, in the Pinellas County Circuit Court, the father filed a “Memorandum of Law.” On October 16, 1996, in the Pinellas County Circuit Court, the father filed a “Sub *712 poena Duces Tecum Without Deposition” to Gift of Life Adoption Services.
On October 18, 1996, the Pinellas County Circuit Court stayed the father’s paternity and custody action pending the resolution of ABC’s and the prospective adoptive parents’ actions in the Hillsborough County Circuit Court. On November 15, 1996, the Hillsborough County Circuit Court dismissed with prejudice the prospective adoptive parents’ declaratory judgment action on the grounds that they lacked standing and that the issue of prebirth abandonment was more appropriate in an adoption proceeding. The prospective adoptive parents appealed the dismissal of their declaratory judgment action to the District Court of Appeal of Florida, Second Circuit.
On November 25, 1996, in the Pinellas County Circuit Court, the father filed an “Emergency Motion for Temporary Custody,” an “Amended Emergency Motion for Temporary Custody,” and a “Notice of Hearing.” On November 27, 1996, following a hearing, the Pinellas County Circuit Court entered an emergency temporary custody order finding ABC to be Baby Boy G.’s legal guardian, awarding the father temporary custody of Baby Boy G., ordering ABC to retrieve Baby Boy G. from the prospective adoptive parents, and ordering ABC to deliver Baby Boy G. to the father. The prospective adoptive parents were anonymously represented by counsel at the hearing, although they had not attempted to intervene in the father’s paternity and custody action.
On December 2, 1996, in the Pinellas County Circuit Court, the father filed an “Amended Emergency Motion for Temporary Custody” and a “Notice of Hearing.” The Pinellas County Circuit Court entered an order granting the father temporary custody of Baby Boy G. and an order “Reinstating Proceedings.” On that same day, the Hillsborough County Circuit Court dismissed ABC’s petition to terminate the father’s parental rights and denied the prospective adoptive parents’ motion to intervene. ABC did not appeal the dismissal. The prospective adoptive parents appealed the denial of their motion to intervene in ABC’s action. On December 3, 1996, in the Pinellas County Circuit Court, the father filed a “Notice of Hearing.” On December 13, 1996, in the Pinel-las County Circuit Court, the father filed a “Notice of Filing.”
On December 16, 1996, in the Tuscaloosa County Circuit Court, ABC filed a motion seeking full-faith-and-credit enforcement of the November 27,1996, emergency temporary custody order of the Pinellas County Circuit Court in order for ABC to comply with the requirement that it retrieve Baby Boy G. from the prospective adoptive parents and return him to his father.
On January 3, 1997, the Pinellas Court Circuit Court granted the father custody of Baby Boy G., pending further order of the court. On January 8, 1997, in the Pinellas County Circuit Court, E.V., the then current wife of the father, filed a “Petition for Adoption” to adopt Baby Boy G., and the father filed a consent so that he and his then current wife would be Baby Boy G.’s parents. On January 13, 1997, the prospective adoptive parents moved to intervene in the Tuscaloosa County Circuit Court action. On January 21, 1997, the Tuscaloosa County Circuit Court granted the motion to intervene and appointed a guardian ad litem to represent the interests of Baby Boy G. On January 22, 1997, the prospective adoptive parents filed an adoption action in the Tuscaloosa County Probate Court. At this time, for the first time, the father learned where Baby Boy G. lived and who had physical custody of Baby Boy G. The Tuscaloosa County Probate Court transferred the prospective adoptive parents’ adoption action, *713 pursuant to § 26-10A-24(e), Ala.Code 1975, to the Tuscaloosa County Juvenile Court. Once the father learned that the prospective adoptive parents had custody of Baby Boy G., the father attempted to see Baby Boy G. and to send him gifts. However, the prospective adoptive parents rebuffed his overtures.
On January 24, 1997, in the Pinellas County Circuit Court, the father filed a “Motion to Compel Production of Documents.” On February 10, 1997, in the Pinellas County Circuit Court, the father filed a “Motion for Disqualification of Counsel” and a “Motion to Strike the Objection to Third Party Subpoena of Dr. Matthew Conrad and Motion for Protective Order.” On February 17, 1997, in the Pinellas County Circuit Court, the father filed an “Amended Motion to Compel Production of Documents” and a “Notice of Hearing.” On March 10, 1997, in the Pi-nellas County Circuit Court, the father filed a “Notice of Taking Deposition Duces Tecum” to the medical records custodian of Helen Ellis Hospital, to Dr. Matthew Conrad, and to the custodian of records for ABC. In the Tuscaloosa County Probate Court, the father filed a motion to dismiss and an objection to the prospective adoptive parents’ adoption action. On March 18, 1997, in the Pinellas County Circuit Court, the father filed a “Subpoena Duces Tecum” to the custodian of records for Helen Ellis Hospital, to Dr. Matthew Conrad, and to the custodian of records for ABC.
On April 1, 1997, in the Tuscaloosa County Circuit Court, the father filed a motion to give full faith and credit to the November 27, 1996, and January 3, 1997, orders of the Pinellas County Circuit Court. On April 10, 1997, in the Tuscaloosa County Circuit Court, the father filed a “Memorandum of Law and Facts” in support of his motion to give full faith and credit to the Pinellas County Circuit Court’s custody orders. On April 15, 1997, the Tuscaloosa County Circuit Court denied ABC’s motion for full-faith-and-credit enforcement of the November 27, 1996, emergency temporary custody order entered by the Pinellas County Circuit Court. The Tuscaloosa County Circuit Court held that the Pinellas County Circuit Court lacked jurisdiction to enter the November 27, 1996, emergency temporary custody order. Additionally, the Tuscaloosa County Circuit Court ordered DNA testing to determine the parentage of Baby Boy G. and awarded the prospective adoptive parents temporary custody of Baby Boy G.
On June 3, 1997, in the Tuscaloosa County Circuit Court, the father filed a “Motion for Stay of Proceedings Pending Appeal of Interlocutory Order” of April 15, 1997. In July 1997, the father petitioned the Court of Civil Appeals for a writ of mandamus ordering the Tuscaloosa County Circuit Court to give full-faith-and-credit enforcement to the November 27, 1996, emergency temporary custody order of the Pinellas County Circuit Court. On July 30,1997, the Pinellas County Circuit Court entered an order declining to continue exercising jurisdiction over the father’s paternity and custody action.
In September 1997, in the Court of Civil Appeals, the father filed a reply brief. On October 9, 1997, in the Tuscaloosa County Circuit Court, the father filed a “Motion for Protective Order” and a letter brief in support of the motion. On October 17, 1997, in the Tuscaloosa County Juvenile Court, the prospective adoptive parents petitioned the court to terminate the parental rights of the birth mother and the father. As grounds for the termination of the father’s parental rights, the prospective adoptive parents asserted that the father had abandoned Baby Boy G. and had *714 committed “other egregious actions against the birth mother.” Upon the prospective adoptive parents’ motion, the actions in the Tuscaloosa County Circuit Court, the Tuscaloosa County Juvenile Court, and the Tuscaloosa County Probate Court were consolidated into one action in the Tuscaloosa County Circuit Court.
On November 5, 1997, the District Court of Appeal of Florida, Second Circuit, issued an opinion affirming the dismissal of the prospective adoptive parents’ declaratory judgment action and the denial of their motion to intervene in ABC’s action to terminate the parental rights of the father in the Hillsborough County Circuit Court. The Florida District Court of Appeal agreed with the two Hillsborough County Circuit Court judges that the prospective adoptive parents lacked standing (1) to bring the declaratory judgment action to determine the consent of the father and (2) to intervene in ABC’s action to terminate the parental rights of the father. On November 7, 1997, the Alabama Court of Civil Appeals denied the father’s petition for a writ of mandamus on the ground that the Pinellas County Circuit Court had declined jurisdiction over the father’s paternity and custody petition. Ex parte C.V., 707 So.2d 249 (Ala.Civ.App.1997).
On February 24, 1998, the Tuscaloosa County Circuit Court permitted the prospective adoptive parents, over the objection of the father, to amend their petition to terminate the father’s parental rights. In March 1998, in the Tuscaloosa Juvenile Court, the father filed a “Pre-trial Brief of Father ... Regarding Relevancy of Pre-Birth Conduct.” From March 9 through March 12, 1998, in the Tuscaloosa County Circuit Court, the father attended the trial. On April 13, 1998, in the Tuscaloosa County Juvenile Court, the father filed a “Post-trial Brief.” On April 28, 1998, the Tuscaloosa County Circuit Court terminated the parental rights of the birth mother and the father. The court stated:
“The Court is now presented with the challenge to correctly and fairly apply the Alabama laws regarding adoptions and termination of parental rights to the facts particular to this case. Furthermore, all attorneys acknowledge, that there has been one issue raised (the issue of whether or not a biological father can abandon his child prior to the child’s birth for purposes of vitiating his consent for adoption) which has apparently not been previously addressed by an appellate court of this state. In order to reach its conclusions and render a final decision on the merits, it is incumbent upon this Court to make a determination as to exactly the basis of the [prospective adoptive parents’] request for relief and further, to make extensive findings of fact from the evidence presented.

“SUMMARY OF LEGAL ARGUMENTS

“1. [The prospective adoptive parents] acknowledge that they must meet their burden of proof by providing clear and convincing evidence to the Court in support of their positions.
“2. [The prospective adoptive parents] basically assert two legal theories in support of their requested relief that this Court approve their petition for the adoption of Baby Boy [GJ. In summary, those legal theories are as follows:
“(A) That [the father’s] consent for adoption pursuant to [§ 26-10A-7, Ala.Code 1975] is either implied based upon his alleged actions as they regard [Baby Boy G.], or that this consent is no longer necessary in the facts of this case. In support of this legal position, the [prospective adoptive parents’] assert that evidence re *715 garding [the father’s] alleged pre-birth abandonment is relevant to prove abandonment of [Baby Boy GJ pursuant to the Alabama laws regarding adoptions, and therefore, his consent is not required or implied.
“The attorneys for the [prospective adoptive parents] acknowledge that no Alabama appellate court has previously recognized their theory of pre-birth abandonment. They cite to the Court two Florida Supreme Court cases as the primary basis for this theory: [The Adoption of Doe], 543 So.2d 741 (Fla.1989), and [The Adoption of Baby E.A.W.], 658 So.2d 961 (Fla.1995).
“(B) Alternatively, the [prospective adoptive parents] assert that [the father’s] parental rights are due to be terminated by this Court pursuant to [§ 26-18-7, Ala.Code 1975],
“3. [The guardian ad litem] also asserts these legal theories in support of her position on behalf of the [Baby Boy G.].
“4. [The father] asserts in response to the [prospective adoptive parents’] claims that pre-birth abandonment is not recognized under the current [law] of Alabama. Additionally, [the father] asserts that the [prospective adoptive parents] cannot meet the burden of proof required to terminate his parental rights and allow the adoption to proceed.
[[Image here]]

“FINDINGS OF FACT

“1. From the undisputed and the disputed evidence presented at trial, the Court hereby makes the following findings of fact. Pertinent facts as presented by [the father are] almost exactly opposite from [the birth mother’s] version of the facts about relevant incidents. In resolving the questions of disputed facts, the Court has considered all relevant factors including, but not limited to, the motivation of the parties, the demeanor and presentation of the witnesses, and the ability or inability of the witnesses to recall with some degree of detail the various events. This is an ore tenus proceeding.
“2. Baby Boy [G.] was born on March 19, 1996 in the city of Tarpon Springs, County of Pinellas, State of Florida....
“3. After a careful review of the relevant adoption laws, the Court can find nothing which would prevent consideration of [the father’s] pre-birth conduct in making a determination whether or not [the father] has ‘abandoned’ Baby Boy [G.]. Furthermore, upon consideration and reflection of the Florida cases mentioned above, this Court cannot find any reason whatsoever why the logic used by the Florida Supreme Court would not be applicable to Alabama adoption eases....
[[Image here]]
“5. Even without the finding by this Court that the requirement for [the father’s] consent to the adoption by the [prospective adoptive parents] was not [sic] waived or implied by [the father’s] conduct toward [the birth mother], there was ample evidence (clear and convincing) presented to allow this Court to conclude that [the father’s] parental rights are otherwise due to be terminated. Clearly [the father’s] actions have led to [Baby Boy G.] being a dependent child. Abandonment and the failure of [the father] to provide even minimal support and necessities also factor into this conclusion. Upon careful consideration of the expert trial testimony of Dr. James Calvert, the Court concludes that, under the fact[s] presented in this case, there is no alternative to the termination of [the father’s] parental rights.
*716 “6. The Court finds that [the birth mother] has executed a consent for Baby Boy [G.] to be adopted by the [prospective adoptive parents]. Said consent was filed with the Probate Court of Tuscaloosa County, Alabama, as a [part] of the initial petition for adoption. [The father] has not consented to allow said adoption.
“7. The Court finds from the evidence that [the father] is, in fact, the biological father of Baby Boy [G.]. The genetics test results received into evidence are virtually conclusive on this issue.
“8. The Court finds that ... [the] Guardian ad litem ... strongly advocates that [the father’s] parental rights as to Baby Boy [G.] should be terminated and that the child should be adopted by [the prospective adoptive parents].
“9. [ABC] has recommended that the [prospective adoptive parents] be allowed to adopt [Baby Boy G.] conditioned upon [the father’s] rights being terminated. Furthermore, [ABC] has granted its consent for the adoption of [Baby Boy G.] by [the prospective adoptive parents].
“10. The Court finds that [the father] and [the birth mother] began seeing each other when she was 17 years old and he was 22. [The father] claims that he did not have sexual relations with [the birth mother] prior to her 18th birthday. At some point during 1995, [the father] and [the birth mother] began living together in an apartment leased to her mother. They found out that [the birth mother] was pregnant in the summer of 1995. Subsequently, [the father] gave [the birth mother] a check and told her to get an abortion. She tore the check up. In August 1995, [the father] and [the birth mother] moved into an apartment at Fifth Seasons apartments. The apartment lease was either in [the birth mother’s] name or her mother’s name. [The father’s] mother helped them with the initial deposit on the apartment. Sometime in November 1995, [the father] moved out of the apartment with [the birth mother], taking virtually everything with him, including all furniture, (except a bed), the food, the dishes, the eating utensils, the sheets, the soap, and even the Christmas tree. Connie Going, a social worker for the Gift of Life Adoption [Services] verified that the apartment was empty when she visited on November 28, 1995. At that time Ms. Going’s agency provided [the birth mother] some food. The Court finds that [the father] had very little contact with [the birth mother] after he moved out of the apartment.
“11. The Court finds from the evidence that [the father] totally abused and abandoned [the birth mother], physically, emotionally, and financially, during her pregnancy with Baby Boy [G.]. [The father] failed to provide any financial support for [the birth mother], although he testified he worked throughout most of the relationship. He did not pay apartment rent, he did not pay the utility bills, he did not pay any of [the birth mother’s] prenatal medical bills, and he did not provide food and the basic necessities of life for the mother of his unborn child....
“12. The Court finds from the evidence that [the father] did not accompany [the birth mother] on her prenatal doctor visits. Social workers from the Gift of Life [Adoption Services] took [the birth mother] to virtually all of her appointments. [The father] paid no prenatal bills and did not pay any bills for the birth of [Baby Boy G.]. [The father] refused [the birth mother’s] request for assistance. [The father] refused to al *717 low [the birth mother] to allow his name to be listed as [Baby Boy G.’s] father on her application for Medicaid benefits. [The father] took no financial responsibility for the [birth] mother ... or [Baby Boy G.J.
“13. The Court finds from the evidence that [the father] physically abused [the birth mother] while she was pregnant on several occasions. [The birth mother] was afraid of [the father] for herself and [Baby Boy G.]. There were at least two incidents in which the police were called after an altercation between [the father] and [the birth mother]. On August 20, 1995, [the father] was arrested on felony charges of aggravated battery and false imprisonment of [the birth mother]. On that occasion, [the birth mother] suffered a busted lip, braises, and a dislocated shoulder. The charges against [the father] were apparently never prosecuted. There were other times when [the father] physically abused [the birth mother] throughout the course of their relationship.
“14. Less than a month after another physical altercation in which the police were called, [the father] left [the birth mother] a note on February 11, 1996, which proposed marriage. This note was left at a time when [the father] was dating his present wife, [E.V.], and just three days before he proposed to [E.V.]. At some time during his relationship with [the birth mother], they had been engaged. When that engagement ended, [the father] took the engagement ring he had given the [birth mother] from her. He subsequently gave the same ring to his present wife, [E.V.]. [The father] and [E.V.] were married in June 1996. They now have a son together.
“15. The Court finds that the Gift of Life Adoption [Services] became involved with [the birth mother] in mid October 1995. [The father] knew about Gift of Life [Adoption Services] prior to the time he acknowledged receipt of a letter from Gift of Life [Adoption Services]. [The father] initiated little or no contact with Gift of Life [Adoption Services]. [The father] knew the approximate birth date of [Baby Boy G.]. He did not attempt to attend the delivery. [The father] knew that [the birth mother] had made plans for the adoption of the child.
“16. It is undisputed that [the birth mother] lied to [ABC] when she became involved with them for purposes of placing the child for adoption. She signed a sworn affidavit on March 20, 1996, that the identity and whereabouts of the biological father were unknown. In April 1996, [the birth mother] lied to [the father] when she told him that the child had died at birth. [The father] did make attempts to find out about the alleged death of [Baby Boy G.]. [The father] hired an attorney ... sometime prior to April 10, 1996, to file a petition to determine paternity against [the birth mother]. Such a petition was filed on or about April 10, 1996, in Pinellas County, Florida. [The father] did not find out that [Baby Boy G.] was alive until the first court appearance before [the Pinel-las County Circuit Court].
“17. [The father] had paid no support to the [prospective adoptive parents] the entire time they have had [Baby Boy G.]. He has not paid for any of [Baby Boy G.’s] medical bills nor provided any other elements of financial support for [Baby Boy G.]. He has not even attempted to do so. [The father] had made no formal requests for visitation in this matter. In summary, the Court cannot discern from the evidence, even one thing [the father] had done to attempt to support [the birth mother] *718 during the pregnancy nor [Baby Boy G.] after he was born. The Court does find that [the father] has made vigorous legal efforts to gain custody after the fact.
“18. The Court finds that [the father] has now married and that he and his wife, [E.V.], have a son who resides with them. [The father] and his wife appear to provide adequate parenting to their child.

“CONCLUSIONS

[[Image here]]
“Clearly, upon the evidence presented, it would amount to a violation of Baby Boy [G.’s] constitutional due process rights to remove him from the only home and only parents he has ever known solely on the basis of biology. As stated by Dr. Calvert, to remove the child from the [prospective adoptive parents’] home at this point in time would be tantamount to the psychological trauma he would experience from the death of both of his parents. The [prospective adoptive parents] have become this child’s parents. To deny the child the benefit of his relationship without some substantial rational basis is a violation of his constitutional rights.

“ORDERS

“IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:
“(1) The Court finds from clear and convincing evidence that [the father’s] conduct as it relates to [Baby Boy G.] and to the birth mother prior to and after [Baby Boy G.’s] birth constitutes abandonment as defined in the Alabama Adoption Code. Therefore, [the father’s] consent for the adoption of Baby Boy [G.] is either implied or not required.
“(2) The Court finds from clear and convincing evidence that there is ample evidence to meet the two-pronged test set forth in Ex parte Beasley [, 564 So.2d 950 (Ala.1990)], in order for the Court to grant the [prospective adoptive parents’] petition to terminate [the father’s] parental rights. The Court finds that [Baby Boy G.] is dependent and that all viable alternatives to a termination of parental rights have been considered and excluded. Furthermore, the Court finds that said termination of parental rights is consistent with the welfare and best interest of said minor child.
“(3) The Court further finds from clear and convincing evidence that constitutional due process considerations on behalf of [Baby Boy G.] clearly dictate that [the father’s] parental rights should be terminated and the child permanently placed with [the prospective adoptive parents].”
(Emphasis added.) The Tuscaloosa County Circuit Court granted the prospective adoptive parents’ petition for adoption and ordered the prospective adoptive parents and the father jointly to pay the guardian ad litem a fee of $9,850.
On May 11, 1998, the father appealed the judgment of the Tuscaloosa County Circuit Court to the Alabama Court of Civil Appeals. On February 12, 1999, the Court of Civil Appeals affirmed the judgment of Tuscaloosa County Circuit Court. C.V. v. 810 So.2d 692 (Ala.Civ.App.1999). Although recognizing that there is no statutory authority in Alabama for pre-birth abandonment as a ground for the termination of parental rights, the Court of Civil Appeals specifically held that the trial court properly had considered the father’s actions or inactions before the birth of Baby Boy G. in determining that the father had abandoned Baby Boy G. and that he had impliedly consented to the adoption of Baby Boy G. On February 26, 1999, the *719 father applied to the Court of Civil Appeals for rehearing. The Court of Civil Appeals denied the father’s application for rehearing on April 30, 1999, with an opinion. On May 14, 1999, the father petitioned this Court for a writ of certiorari.
Findings of fact based on ore tenus evidence are presumed correct, and a judgment based on those findings of fact will not be reversed unless it is clearly erroneous, manifestly unjust, without supporting evidence, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala.1995). The reason for this tenet of the law, the ore tenus rule, is that the trial judge who sees and hears a witness testifying in person in court can better judge the credibility of the witness than a reviewing appellate court can judge the credibility from only the typed words in the transcript. Ex parte Walters, 580 So.2d 1352 (Ala.1991). An appellate court reviewing a record that contains a witness’s deposition is as able as the trial judge to find facts from the deposition. See Muscogee Construction Co. v. Peoples Bank & Trust Co., 286 Ala. 258, 238 So.2d 883 (1970), and Carnegie v. Carnegie, 261 Ala. 146, 73 So.2d 556 (1954). Thus, the ore tenus rule does not apply to findings of fact based on testimony contained in the witness’s deposition and not orally presented to the trial judge by the witness in person. Smith v. Cook, 220 Ala. 338, 124 So. 898, 900 (1929). See also Eldridge v. Loftis, 723 So.2d 562 (Ala.1998); Hamrick v. City of Albertville, 238 Ala. 82, 189 So. 545 (1939); Burleson v. Clark, 232 Ala. 119, 167 So. 263 (1936); Taylor v. Cowart, 228 Ala. 317, 153 So. 403 (1934); Jones v. Stollenwerck, 218 Ala. 637, 119 So. 844 (1928). “[I]n deciding appeals, no weight shall be given the decision of the trial judge upon the facts where evidence is not taken orally before the judge, but in such cases the Supreme Court shall weight the evidence and give judgment as it deems just.” § 12-2-7(1), Ala.Code 1975. While the trial judge in this case accepted virtually entirely all of the birth mother’s accusations against the fathér, these findings are not presumed correct inasmuch as they are based only on the birth mother’s deposition testimony. She did not testify in person before the trial judge. A second limitation on the ore tenus rule is that it does not apply to rulings on questions of law. Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994).
A parent has a fundamental liberty interest in the care, custody, and management of his or her child. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). “It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.” Prince v. Massachusetts, 321 U.S, 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). “ ‘The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, ... [262 U.S. 390] at 399 [43 S.Ct. 625, 67 L.Ed. 1042 (1923)] ..., the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, ... [316 U.S. 535] at 541 [62 S.Ct. 1110, 86 L.Ed. 1655 (1942)] ..., and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 [85 S.Ct. 1678, 14 L.Ed.2d 510] ... [(1965)] (Goldberg, J., concurring).’ ” Hodgson v. Minnesota, 497 U.S. 417, 447-48, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

Choice of Law

Both the prospective adoptive parents and the trial court chose to apply Alabama law. The father does not challenge their *720 choice of law. The prospective adoptive parents, the trial court, and the Court of Civil Appeals found Florida caselaw persuasive, but not controlling, on the issue of prebirth abandonment.
Alabama law is controlling in this case. See Fitts v. Minnesota Mining & Mfg. Co., 581 So.2d 819 (Ala.1991). Moreover, for the purpose of interpreting Alabama statutory law, Florida caselaw is not persuasive on the issue whether prebirth abandonment can be a ground for consent to an adoption. The Florida cases cited by the prospective adoptive parents, the trial court, and the Court of Civil Appeals are Adoption of Baby E.A.W., 658 So.2d 961 (Fla.1995), and Adoption of Doe, 543 So.2d 741 (Fla.1989). In Adoption of Doe, the Florida Supreme Court interpreted the statutory term “abandoned,” defined in the Florida Adoption Code, to permit the Florida judges in an adoption proceeding to consider a father’s prebirth conduct toward the mother as a factor in determining whether the father had abandoned his child. The Florida Legislature subsequently codified the Florida Supreme Court’s interpretation into the Adoption Code. See Fla.Stat.Ann. § 63.032(14) (West.Supp.1997). In Adoption of Baby E.A.W., supra, the Florida Supreme Court relied upon § 63.032(14) in affirming the judgment of the trial court finding that the father had abandoned his child. Florida statutory criteria are not persuasive in interpreting differently written Alabama statutes regarding abandonment by a parent. Therefore, the controlling issues in this case are whether in 1997 Alabama recognized “prebirth abandonment” by a father as a ground for terminating parental rights and whether in 1997 Alabama recognized “prebirth abandonment” by a father as implied consent to adoption of his child or as relinquishment of his parental rights.

Termination of Parental Rights

As a common-law state, Alabama follows the English common law that is not inconsistent with the Constitution and the laws of this State. § 1-3-1, Ala.Code 1975. “Proceedings to terminate parental rights were unknown at common law. In re Zink, 264 Minn. 500, 119 N.W.2d 731 (1963). Therefore, termination proceedings are purely statutory.” In the Matter of the Termination of Parental Rights of P.A.M., 505 N.W.2d 395, 397 (S.D.1993). See also Canvll County Dep’t of Social Servs. v. Edelmann, 320 Md. 150, 577 A.2d 14 (1990); In the Matter of McDuel, 142 Mieh.App. 479, 369 N.W.2d 912 (1985); Petition of Sherman, 241 Minn. 447, 63 N.W.2d 573 (1954); S.K.L. v. Smith, 480 S.W.2d 119 (Mo.Ct.App.1972); D.J.A. v. Smith, 477 S.W.2d 718 (Mo.Ct.App.1972); A.E. v. State, 743 P.2d 1041 (Okla.1987); In the Matter of Edmunds, 560 P.2d 243 (Okla.Ct.App.1977); In re A.A., 134 Vt. 41, 349 A.2d 230 (1975); Church v. Church, 24 Va.App. 502, 483 S.E.2d 498 (1997); Willis v. Gamez, 20 Va.App. 75, 455 S.E.2d 274 (1995). Because the termination of parental rights is purely statutory, statutes governing the termination of parental rights must be strictly construed. See Ex parie Sullivan, 407 So.2d 559, 563 (Ala.1981).
“[T]he primary focus of a court in cases involving the termination of parental rights is to protect the welfare of children and at the same time to protect the rights of their parents.” Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). See § 26-18-7(a)(1), Ala.Code 1975. Termination of parental rights is a drastic measure and once done cannot be undone. “[A] court should terminate parental rights only in the most egregious of circumstances. Moreover, the age-old principle that, as against a challenge by a nonparent, a parent who is neither unfit nor guilty of forfeiting his or her parental rights is entitled to custody *721 has been strengthened rather than weakened by the 1984 adoption of the Uniform Child Protection Act[, § 26-18-1 et seq., Ala.Code 1975].” Ex parte Beasley, 564 So.2d at 952.
When a nonparent is the petitioner seeking to terminate the parental rights of a parent, the petitioner must present dear and convincing evidence that (1) the child is dependent, (2) one of the grounds in § 26-18-7 exists, and (3) no viable alternative to termination of the parental rights exists. Ex parte Beasley, supra. Clear and convincing evidence is
“[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
§ 6-11-20(4), Ala.Code 1975 (emphasis added).
“In viewing the ‘dependency’ issue in the context of [a nonparent’s] attempt to terminate parental rights, the [nonparent] would have standing only where both parents are found to be unfit or otherwise unable to discharge the responsibilities of parenthood.” Ex parte Beasley, 564 So.2d at 954 (emphasis added). The Tuscaloosa County Circuit Court considered the father’s prebirth conduct in determining Baby Boy G. to be a dependent child. In January 1997, the Alabama Legislature had not enacted a statute requiring a putative father to support his unborn child and authorizing Alabama courts to consider the putative father’s prebirth support or lack thereof in determining whether the father had abandoned his child.[7] -At that time, a putative father owed no duty of support to a child until his' paternity of the child had been established. Ex parte State of California, 669 So.2d 884 (Ala.1995). See Keener v. State, 347 So.2d 398 (Ala.1977), Upton v. State, 255 Ala. 594, 52 So.2d 824 (1951), and Law v. State, 238 Ala. 428, 191 So. 803 (1939). Therefore, the father did not owe a duty to support Baby Boy G. until the Tuscaloosa County Circuit Court established his paternity as to Baby Boy G., when that court simultaneously terminated his parental rights! Noteworthily, the July 9, July 10, and November 27, 1996 orders of the Pinellas County Circuit Court in favor of the father were interlocutory only, and never final.
Moreover, because the prospective adoptive parents hid their identity in the various Florida court proceedings, the father did not learn where Baby Boy G. lived or who had physical custody of Baby Boy G. until January 1997, when the prospective adoptive parents dropped their shield of anonymity and petitioned the Tuscaloosa County courts to terminate the father’s parental rights and to grant their adoption of Baby Boy G. To penalize the father for not providing support to the prospective adoptive parents for Baby Boy G. while the prospective adoptive parents were hiding their identities and address and were hiding Baby Boy G. himself would violate the spirit of the “clean hands” doctrine. J. & M Bail Bonding Co. v. Hayes, 748 So.2d 198, 199 (AIa.1999) (“The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when the party’s own wrongful conduct renders the assertion of such legal *722 rights ‘contrary to equity and good conscience.’” (quoting Draughon v. General Fin. Credit Corp., 362 So.2d 880, 884 (Ala.1978))). To penalize the father for failing to contribute support to the prospective adoptive parents after they revealed themselves and Baby Boy G. but while they did their utmost to deny and to terminate the father’s parental rights would be equally unfair.
Additionally, once prospective adoptive parents have received an adoptee into their home and have filed a petition for adoption, a court “shall [enter an interlocutory order] delegating to the [prospective adoptive parents] (1) custody, except custody shall be retained by ... the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility for the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court.” § 26-10A-18. Therefore, once the prospective adoptive parents petitioned to adopt Baby Boy G. they assumed responsibility for his care and support, and, thus, relieved the father of any duty of support.
Finally on the issue of dependency, while the father’s prebirth conduct toward the birth mother and his alleged lack of financial support for the birth mother could have been relevant to the father’s fitness as a parent, the prospective adoptive parents did not allege, and the Tuscaloosa County Circuit Court did not find, the father to be unfit. Therefore, the Tuscaloosa County Circuit Court’s finding of dependency, the first sine qua non for termination of parental rights according to Ex parte Beasley, supra, is not supported by clear and convincing evidence. I will, nonetheless, examine the issue of the second Ex parte Beasley sine qua non, the existence, vel non, of grounds for termination of the father’s parental rights.
“The Legislature ... [in § 26-18-7, Ala. Code 1975] has established specifically the grounds upon which a court must base any order to terminate parental rights.” Ex parte Beasley, 564 So.2d at 953. At the time material to this case, those grounds, contained in the Child Protection Act, were:[8]
“(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, as herein defined;
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for the needs of the child;
“(3) That the parent has tortured, abused, cruelly beaten or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat or other *723 wise maltreat the child, or the said child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling;
“(4) Conviction of and imprisonment for a felony;
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent;
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) ■ Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent;
“(3) Failure by the parents to maintain consistent contact or communication with the child;
“(4) Lack of effort by the parent to adjust his circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
“(c) In any case where the parents have abandoned a child as herein described and such abandonment continues for a period of six months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents.”
§ 26-18-7, Ala.Code 1975 (emphasis added). The order terminating the father’s parental rights relies on the ground of abandonment.
The prospective adoptive parents assert that the father abandoned Baby Boy G. and the birth mother by neglecting and abusing the birth mother, by failing to provide financial support to the birth mother before the birth of Baby Boy G., and by failing to provide support to the prospective adoptive parents for Baby Boy G. They assert also that the father’s abandonment continued “for a period of six months next preceding the filing of [their adoption] petition.” Abandonment, as defined by the Child Protection Act, is
“[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
§ 26-18-3(1) (emphasis added). This definition does not contemplate abandonment of an unborn child by a father, because a father cannot have custody of the unborn child. Simply put, § 26 — 18—7(a)(1) does not authorize a trial court to terminate parental rights for “prebirth abandonment” by a father. While the father’s prebirth conduct towards the birth mother and his alleged lack of financial support of *724 the birth mother could have been relevant to his fitness as a parent, the father’s prebirth conduct toward the birth mother was not relevant to whether the father abandoned Baby Boy G., a child. Moreover, the prospective adoptive parents did not prove that the father intentionally and voluntarily relinquished his rights to Baby Boy G. after Baby Boy G.’s birth. Indeed, the evidence of the father’s continual efforts to find and to recover his child is compelling. Therefore, the prospective adoptive parents failed to prove by clear and convincing evidence that the father had abandoned Baby Boy G. A fortiori, I agree with several of my colleagues on this Court insofar as they observe in their special writings that the evidence in this case cannot support the conclusion that any abandonment by the father “eontinue[d] for a period of six months next preceding the [prospective adoptive parents’] filing of the petition” (§ 26-18-7(c) quoted above) so as to terminate the father’s parental rights, as the Child Protection Act would require for the termination of the father’s parental rights.
Finally, the record does not support a finding of the third and last Ex parte Beasley sine qua non for the termination of parental rights — that no viable alternative to the termination of parental rights exists. The obvious alternative in this case is simply not to terminate the father’s parental rights and to return this child to his natural father. The trial court in the case before us did not find the father unfit. Indeed, the termination order specifically
“finds that [the father] has now married and that he and his wife have a son who resides with them. [The father] and his wife appear to provide adequate parenting to their child.”
In Ex parte D.J., 645 So.2d 303, 305 (Ala.1994), this Court stated:

“I. Parental Presumption

“The courts of this state, in accord with the common law, have long presumed that the entrustment of children to the care and custody of their natural parents serves the best interests of the children. For example, in Striplin v. Ware, 36 Ala. 87, 89-90 (1860), this Court explained:
“ ‘The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for.
“ ‘... So strong is the presumption, that “the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all”; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of nature, must feel the greatest affection for it, and take the deepest interest in its welfare — that the parental authority will not be interfered with, except in case of gross misconduct or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child.’ [(Emphasis added.)]
“See also Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983) (‘The prima facie right of a natural parent to the custody of his ... child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right ... is in the best interest *725 ... of the child as a matter of law” [emphasis in Mathews]); Ex parte Berryhill, 410 So.2d 416 (Ala.1982); Ex parte Sullivan, 407 So.2d 559, 563-64 (Ala.1981) (‘The law recognizes that a higher authority ordains natural parenthood, and a fallible judge should disturb the relationship thus established only where circumstances compel human intervention’); Harris v. Harris, 251 Ala. 687, 39 So.2d 232 (1949); Chandler v. Whatley, 238 Ala. 206, 189 So. 751 (1939) (‘The law, indulging the presumption that the welfare of [the] child will he best conserved by awarding her custody to her father, rather than the step-father, ordains that this shall be done, unless such presumption is overcome by clear and convincing evidence that the father is ... unfit’ [(Emphasis added.)]); Stod-dard v. Bruner, 217 Ala. 207,115 So. 252 (1928). These cases thus reveal not only the antiquity of the rule followed in this state but also the policy and rationale underlying the parental presumption.”
Because none of the three Ex parte Beasley sine qua nons for termination of the father’s parental rights exists, the Child Protection Act does not provide authority for the judgment of the trial court.

Implied Consent to Adoption

“ ‘Adoption is not merely an arrangement between the natural parents and adoptive parents, but is a status created by the state acting as parens patriae, the sovereign parent. Because the exercise of sovereign power involved in adoption curtails the fundamental rights of the natural parent[s], the adoption statutes must be closely adhered to.’ ” Ex parte Sullivan, 407 So.2d 559, 563 (Ala.1981) (quoting Davis v. Turner, 337 So.2d 355, 360-61 (Ala.Civ.App.1976)). “Adoption is strictly statutory.... Being unknown at common law, it cannot be achieved by contract....” Id.
According to the Alabama Adoption Code, a parent may impliedly consent to an adoption or may relinquish of his or her parental rights by:
“(1) Leaving the adoptee without provision for his or her identification for a period of 30 days; or
“(2) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months; or
“(3) Receiving notification of the pen-dency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days.”
§ 26-10A-9, Ala.Code 1975, as it read before the amendment effective June 11, 1999.[9] The term adoptee connotes a born child capable of being adopted.
The prospective adoptive parents assert that the father impliedly consented to the adoption of Baby Boy G. by emotionally and financially abandoning the birth mother before the birth of Baby Boy G. While the father’s prebirth conduct towards the birth mother and his alleged lack of financial support for the birth mother could have been relevant to a determination of his fitness as a parent, the father’s pre-birth conduct towards the birth mother was not relevant to determining whether the father abandoned Baby Boy G. § 26- *726 10A-2(1), Ala.Code 1975. The definition of the terna “abandonment” in the Alabama Adoption Code, § 26-10A-1 et seq., Ala. Code 1975, differs from the definition in the 1984 Alabama Child Protection Act, § 26-18-3(1). Section 26-10A-2(l) in the Alabama Adoption Code defines abandonment as
“[a] voluntary and intentional relinquishment of the custody of a minor by a parent, or a withholding from the mi-, nor, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or the failure to perform the duties of a parent.”
(Emphasis added.) A “minor” is “[a] person under the age of 19 years.” § 26-10A-2(7). The only difference in the definitions of abandonment in § 28-18-3(1), as previously quoted, and § 26-10A-2(l) is that § 26-10A-2(l) uses the term “minor” rather than “child.” The definition of a minor clearly envisions a child who has been born. Because adoption in Alabama is purely statutory, statutes governing adoption must be strictly enforced. Ex parte Sullivan, supra. Thus, the prebirth conduct of the father toward the birth mother was not a ground under § 26-10A-9, as it read before the amendments effective June 11, 1999, for implying consent to an adoption.
Nor does the father’s post-birth conduct meet any of the criteria for implied consent stated by the plain language of the applicable version of § 26-10A-9 quoted above. The father did not leave Baby Boy G. without provision for his identification for 30 days. § 26-10A-9(l). Rather, the father filed his paternity and custody action less than 30 days after Baby Boy G.’s birth. The father did not “knowingly” leave Baby Boy G. with the prospective adoptive parents “without provision for support and without communication, or [did] not otherwise maintain[ ] a significant parental relationship” with Baby Boy G. “for a period of six months.” § 26-10A-9(2), as it read before the amendment effective June 11, 1999. The father did not learn the identity of the prospective adoptive parents and thus the whereabouts of Baby Boy G. until January 1997. As previously stated, once the prospective adoptive parents filed their adoption petition, they assumed a duty to support Baby Boy G., § 26-10A-18, and they actively rebuffed the father’s efforts to establish a significant parental relationship once he located Baby Boy G. Further, since the birth of Baby Boy G., the father at all times vigorously pursued his parental rights. Finally, he did not fail “to answer or otherwise respond to the [adoption] petition within 30 days” after receiving notice. § 26-10A-9(3). Rather, he promptly and thoroughly opposed the petition.
Therefore, the prospective adoptive parents faded to present clear and convincing evidence that the father impliedly consented to Baby Boy G.’s adoption or that the father relinquished his parental rights to Baby Boy G. Moreover, even if prebirth conduct at the time of Baby Boy G.’s gestation could have constituted implied consent, and even if this father’s prebirth conduct were to have constituted implied consent, I would concur with the special writings of several of my colleagues on this Court insofar as they opine that this father impliedly and effectively withdrew any such consent. Thus the Tuscaloosa County Circuit Court erred in holding that the father had impliedly consented to the adoption of Baby Boy G.

Conclusion

Accordingly, because the Tuscaloosa County Circuit Court erred in terminating the father’s parental rights and in award *727 ing custody of Baby Boy G. to the prospective adoptive parents, and the Court of Civil Appeals erred in affirming the judgment of the Tuscaloosa County Circuit Court, we should, as we do, reverse its judgment. Because the evidence in this case does not tend to prove any of Alabama’s applicable statutory criteria for terminating the father’s parental rights, we should, as we do, adjudge that C.V.’s parental rights as the father of Baby Boy G. are not terminated and remand this cause directly to the Tuscaloosa County Circuit Court for proceedings to determine the proper custody of Baby Boy G.

. See § 26-10A-9(l), as amended effective June 11, 1999, which now requires a father to support his unborn child.

. Section 26-18-7, Ala.Code 1975, was amended effective April 22, 1998. The quoted material is from § 26-18-7 as it read before that amendment.

. Effective June 11, 1999, § 26-10A-9(l) provides: "Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.” Thus, as of June 11, 1999, Alabama recognizes "pre-birth abandonment” by a father as implied consent to an adoption, or as relinquishment of his parental rights. Id.